Gary HOWARD & Ronald Tucker, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 386–87C.

United States Court of Federal Claims.

April 29, 1994.

Rick Harrison, with whom was Hamilton Rial, Austin, TX, for plaintiffs.

Harold D. Lester, Jr., Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Jeffrey R. Davis, for defendant. Arthur Rettinger, United States Customs Service, Washington, DC, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988 & Supp. IV 1992). It arises out of an unusual and troubling set of circumstances. Plaintiffs seek damages for the breach of alleged oral contracts between themselves and United States Customs Service ("Customs") personnel to compensate them for assisting in the apprehension of an alleged arms smuggler through a complex sting operation. Trial was held November 29 through December 4, 1993, in Austin, Texas. Although the court is persuaded that plaintiffs acted with good motives and in some sense became victims of the sting, they nevertheless have not established a legal entitlement to relief. We hold first that no enforceable contract, either for a commission or expenses, existed between the parties and, second, that even if an agreement to allow plaintiffs to retain a commission on the sale of weapons in the sting operation existed, the government did not breach it.

## FACTS

*Background*

Gary Howard and Ronald Tucker ("plaintiffs") are decorated Vietnam veterans and former law enforcement officers who reside in Texas. They met in the early 1970s while supplying information for an investigation by the United States Bureau of Alcohol, Tobacco, & Firearms ("ATF"). Both Mr. Howard and Mr. Tucker continued to provide information to various federal agencies throughout the 1970s, though each engaged in other pursuits as well.

Mr. Howard became involved in arms-deal investigations in late 1979 while in London to sell oil-drilling equipment. Having been invited to observe the closing of a crude oil sale, Mr. Howard was approached by one of the other parties present, who asked if Mr. Howard knew anyone in the small-arms business. Mr. Howard facilitated an arms transaction that he thought was legitimate; how-

ever, it turned out to be a black-market sale of arms to the Republic of South Africa, which had arranged to furnish a false end-user certificate for the arms.

Mr. Howard reported the irregular aspects of the deal to the British authorities. In the course of the ensuing investigation, Scotland Yard interviewed Mr. Howard. That interview was observed by a man later identified as Calvin White, Assistant Customs Attache at the U.S. Embassy in London. In a subsequent meeting with Mr. White, Mr. Howard agreed to act as a confidential informant for Customs. Mr. White specifically requested that Mr. Howard collect information on arms sales to Israel, the Soviet Bloc, the Middle East, and South Africa. In that capacity, Mr. Howard and Mr. Tucker, the latter by then recruited into the operation, posed as international arms dealers and assisted Customs in attempting to apprehend persons suspected of violating the U.S. arms export control laws. Two operations, denominated "Houston I" and "Houston III," are relevant to these proceedings.

The convoluted facts leading to these operations will only be summarized, but to understand them at all, we must briefly tell a tale of two cities—Washington, D.C., and Houston, Texas. Although formally this case involves a dispute between plaintiffs and Customs, much of the relevant conflict appears to have existed between the two different cultures and outlooks of Customs headquarters in Washington and the Customs field office in Houston. In Houston, Special Agent in Charge ("SAC") Frank Chadwick, with the help of a staff of agents that included Group Supervisor Norman Buselmeier and Special Agent Don Winkler, employed a style that headquarters later found to be unorthodox and insufficiently attuned to formalities. His immediate supervisor, Houston Regional Director (Investigations) Hulen Rigsby, evidencing at least his acquiescence in this philosophy,[1] delegated substantial enforcement authority to Mr. Chadwick.

In Washington, Assistant Commissioner for Border Operations George Corcoran, aided by his deputy William Green, oversaw

---

1. The evidence also indicated that Mr. Rigsby might have encouraged a more freewheeling

style than headquarters desired and that he resented their oversight.

Customs' enforcement operations.[2] Beneath Mr. Corcoran and Mr. Green sat the Office of Investigations, directed by Martin White. The Office of Investigations nominally controlled all Customs investigations throughout the country; however, the evidence indicates that little or no supervisory authority was exercised in the initial stages of the sting operations at issue in the case at bar. At the later stages of Houston III, when Washington tried to bring some oversight to bear on the operation, the results of the prior laissez faire approach were manifest in friction and deception. It became apparent during trial that the balmy approach of the Houston office to procedural niceties created expectations on plaintiffs' part that were undone when exposed to the frosty winds later emanating from Washington. And therein lies this lawsuit.

*Houston I*

In early 1981, Mr. Howard, posing as an arms broker acting as an agent of Balotta Trading Establishment ("Balotta"), a Liechtenstein corporation controlled by Mr. Howard and Mr. Tucker, received a telephone call from another arms broker representing Servotech International Establishment ("Servotech"). The Servotech broker inquired about the purchase of weapons in the United States for delivery to the Republic of South Africa. Mr. Howard informed Customs of the proposed transaction. Shortly thereafter, plaintiffs developed a relationship with agents Winkler, Buselmeier, and Chadwick of Customs' Houston field office.

Plaintiffs described to the Customs agents Servotech's request, through two international arms dealers, Towers and Parks, to purchase weapons illegally. Plaintiffs volunteered to assist Customs to apprehend Towers and Parks in exchange for permission to retain a commission or brokers' fee on the arms transaction. Mr. Chadwick testified that plaintiffs did not want to be paid by Customs; all they wanted was their normal, standard commission from sales of equipment. The agreement contemplated that Parks and Towers would pay an agreed

amount for the weapons, the weapons would be purchased with this money, and plaintiffs would keep the amount of money that was not spent acquiring the weapons. (Although Mr. Chadwick testified that he made no agreement for plaintiffs to keep the "excess funds" per se, the excess funds would have constituted a five to ten percent commission had the transaction gone as planned.) Mr. Chadwick intended that plaintiffs would use the money they retained in Houston I to "run other operations." Tr. at 38–39 (Howard testimony).

Customs agents agreed orally with plaintiffs on this matter. No agreement of any kind was reached for reimbursement of expenses for Houston I. Mr. Chadwick did, however, inform plaintiffs before the operation that he would apply on their behalf for a moiety award of 25% of the value of any items that Customs seized. *See* 19 U.S.C. § 1619 (1988 & Supp. IV 1992) (amended in 1984, 1986). Finally, Mr. Chadwick testified that he told plaintiffs that Customs would reimburse their travel expenses as long as they obtained prior approval for them and would purchase any evidence that plaintiffs acquired.

Parks and Towers controlled a letter of credit for approximately $1.3 million. Before the purchase of weapons, Servotech, through Parks and Towers, made two wire transfers from the letter of credit totaling approximately $1.2 million into Balotta's account at the Republic National Bank in Dallas. Although the plan originally called for the purchase of approximately $1.1 million worth of arms, Customs could obtain only a portion of the requested weapons worth approximately $629,000. Mr. Howard transferred that amount from Balotta's account to Customs, which then purchased the bulk of the weapons for Servotech. Plaintiffs spent $14,000 on additional weapons and $50,000 on magazines for some of the weapons. Plaintiffs retained the remainder of the money, approximately $600,000. Plaintiffs also recovered the $50,000 spent on the magazines, which were never shipped. After deducting

---

2. Atop the entire Customs hierarchy and reporting to the Assistant Secretary of the Treasury for Enforcement, Commissioner William von Raab

took no active part in the sting operations at issue here.

expenses of approximately $150,000, plaintiffs retained $475,000 from Houston I.

On May 12, 1981, Customs agents delivered the weapons to Houston Intercontinental Airport and arrested Towers and Parks while they were inspecting the weapons. Towers and Parks pled guilty to attempting wilfully to export weapons without a license in violation of 22 U.S.C. § 2778(a), (b), and 22 C.F.R. § 127.01. As a result of the sting, the most successful in Customs' history, the government seized one Boeing 707 aircraft, 1,146 M16A1 automatic assault rifles, 259 pistols, and 100 M203 grenade launchers. The United States later obtained forfeiture of this property, which had a value of $8,463,761.41. Based in part on the magnitude of the forfeiture, Frank Chadwick and Customs District Director Walter D. Sherman recommended in November 1981 that the United States pay plaintiffs a moiety award of $250,000. The government paid this award to plaintiffs in November 1985.

*Houston III*

In May 1981, Mr. Howard and Mr. Tucker advised Customs that Ian Smalley, a British citizen alleged to be a major international arms smuggler, had contacted them wishing to purchase and export weapons without obtaining the proper licenses. After initial reluctance on plaintiffs' part, they agreed with agents Chadwick, Winkler, and Buselmeier to attempt against Mr. Smalley a sting operation similar to that in Houston I. At this point, plaintiffs and Mr. Chadwick entered into the arrangement at issue here.

It is somewhat misleading to speak of a formal agreement. If a contract existed, it arose out of continued discussions over a sixteen-month period. Over the course of time, a highly unusual relationship developed between Messrs. Howard and Tucker on the one hand and agents Buselmeier and Winkler—and to some extent, Chadwick—on the other. What began as an effort by the agents to use Howard and Tucker for Customs' ends evolved into an operation directed primarily by plaintiffs. Plainly Buselmeier

and Winkler never sat down and negotiated contract terms with Howard and Tucker. The special agents were interested in apprehending and convicting Smalley and they focused on that goal. Howard and Tucker were similarly interested in seeing Smalley convicted, but had overriding financial concerns. After listening to testimony from the key players over a five-day period, the court is persuaded that virtually no explicit discussions of compensation took place. The few that did occur consisted of plaintiffs' concerns expressed to Buselmeier and Winkler.

Plaintiffs allege that the following four-part agreement evolved: (1) Plaintiffs would retain a commission on any arms sale as agreed in Houston I; (2) Unless confronted with the inability to make a prosecutable case against Mr. Smalley, Customs would pursue the case to its logical conclusion; but if Mr. Smalley backed out, plaintiffs would cover their own expenses; (3) If the government were to file only conspiracy charges or drop the investigation before the case reached its logical conclusion, then the government'would reimburse plaintiffs for any [3] expenses incurred in furtherance of the operation; and (4) the government would guarantee plaintiffs a final net profit of at least $1 million dollars.

Plaintiffs testified that they initially reached this agreement with Mr. Chadwick and confirmed it later with Washington SAC William Rudman after he took over the case.[4] Mr. Chadwick testified that he and plaintiffs agreed to the same financial arrangement for Houston III as had existed for Houston I. Mr. Rudman recalled Mr. Chadwick asking him in 1981 whether plaintiffs could legally "take a commission ... from a prospective defendant in the course of an undercover operation." He told Chadwick that he thought it was legal, but to check with Stuart Seidel of Customs' Chief Counsel's Office. Mr. Rudman, too, knew that plaintiffs expected compensation in some form for their role in Houston III, but does not recall discussing any compensation arrangements with them.

---

3. Mr. Tucker testified that if he had "incurred [$1 billion dollars in] expenses, [he] would expect reimbursement [from] the government." Tr. at 443.

4. Plaintiffs also testified that they dealt directly with no one in Customs higher in rank than Mr. Rigsby. They did meet with Assistant U.S. Attorney Wes Rivers of Beaumont, Texas, in late 1981.

Mr. Chadwick also testified that initial knowledge of the existence of Houston III extended up to Patrick O'Brien, Martin White, and Rollin Klink in headquarters. George Corcoran and William Green may have known about it, too. Of course, knowledge of the operation's existence does not equate with knowledge of the financial arrangements. The government concedes that the agents in the Houston office, as well as some of their superiors, were aware of plaintiffs' expectation of receiving a commission. The government does not concede, however, that the understanding is contractually enforceable. Furthermore, the government denies that any contract was struck containing the last three alleged elements.

Plaintiffs began setting up a sting operation against Mr. Smalley in June, 1981. Planning and negotiations continued through that summer. During initial meetings with plaintiffs, Mr. Smalley's "wish list" included 100 self-propelled artillery pieces, 200 M48A5 main battle tanks, ammunition for the tanks and artillery pieces, and 600 Redeye missiles for shipment to Iran. By autumn 1981, Mr. Smalley had negotiated a first shipment of 100 M48A5 main battle tanks and 8300 TOW missiles. On October 8, 1981, the United States Army permitted Mr. Smalley to visit the United States Army Depot at Anniston, Alabama, to inspect military hardware, including an M48A5 tank. At that time, the operation was scheduled to be completed in November or December of 1981; however, it continued on into 1982 in part because of the State Department's concerns about the operation's potential effect on the Iran claims settlement. Perhaps in response to that concern, Mr. Smalley had by early 1982 redirected his efforts toward a sale to Iraq.

During the course of Houston III, plaintiffs expended a large amount of money in furtherance of the operation. Former Customs agent Jack Compton testified that Mr. Chadwick had told him that "just about every aspect of the [Houston III] operation was funded by the informant and it couldn't have been done without that funding." At the very least, plaintiffs paid some travel and meal expenses for themselves and the Customs agents who worked with them, char-

tered a Lear jet for the inspection trip to Anniston, and hired eighteen former military personnel, including Richard Meadows and George Petrie, as "consultants," to assist in providing security for the transfers of arms. Of the $1.14 million in documented, claimed expenses, over half was paid by plaintiffs as fees and expenses to Mr. Meadows and his team of consultants. In addition, plaintiffs maintained two houses in Arlington, Texas, one in Plano, Texas, and one at Lake Tahoe at their own expense for use in Houston III. For safety reasons, plaintiffs moved their families into hiding in Florida. To maintain their cover as "men of means," plaintiffs had their employees fly on the Concorde to Europe, flew first class and paid for first-class upgrades for Mr. Winkler, and hired a prostitute for Mr. Smalley. Mr. Howard's father, a draftsman, prepared some documents at his own expense for a Customs front company, Carrington International. Early in 1982, plaintiffs' employees flew to England at plaintiffs' expense several times to deal with Mr. Smalley when he could not travel. While Houston III was active, plaintiffs requested reimbursement, and Customs reimbursed them, for only one plane trip, from Texas to Washington, D.C., in 1982.

Throughout all these activities, plaintiffs maintained close contact with Buselmeier and Winkler, and Buselmeier and Winkler spent much of their time with plaintiffs. They traveled, ate, planned, and lodged together. Plainly, they established close personal relationships that extended to members of the others' families as well. Plaintiffs' unorthodox paramilitary force conducted training exercises at a ranch in Texas. Buselmeier, Winkler, and their families, as well as other government personnel, attended. Plaintiffs testified that the agents approved their major expenses, including the assembly and payment of the security team and the charter of the Lear jet; Mr. Winkler denied having approved any expenses, but admitted knowledge of them. Mr. Chadwick and Mr. Rudman also admitted that they were aware that plaintiffs were spending money in furtherance of Houston III, but differed on their understanding of plaintiffs' source of reimbursement: Chadwick thought that plaintiffs' only avenue lay in a moiety award; Rudman

believed, based on conversations with Mr. Howard, that plaintiffs were looking to Smalley for reimbursement. Both Chadwick and Rudman agreed that plaintiffs should not go uncompensated; Mr. Rudman testified that he would not have asked plaintiffs to continue the operation if he had known that they would not be compensated.

Mr. Howard was the first recipient of all monies from Mr. Smalley; he controlled the money in his own bank accounts or in corporate accounts. In the course of the Houston III operation, plaintiffs received a total of three payments from Mr. Smalley. The first payment, in September or October 1981, consisted of $250,000. Plaintiffs turned over $100,000 of this payment to Agent Winkler either as a purported bribe or simply for safekeeping. They also either placed $50,000 into a bank account opened for Mr. Smalley, or sent it to Smalley's architect or attorney, and paid an additional $100,000 into escrow as a deposit on a ranch for Mr. Smalley. The second payment, in October or November 1981, consisted of over $600,000. The final payment, made in February 1982, consisted of $380,000. Thus, plaintiffs had received and retained approximately $1 million dollars paid to them by Mr. Smalley in February 1982. In November 1981, plaintiffs also retained approximately $400,000 from the Houston I operation. Plaintiffs seek $1.14 million in expenses here.

At some point in late 1981, Customs headquarters began to expand its involvement in Houston III. Mr. Corcoran testified that he learned about the Houston III financial arrangements in November 1981, when Ken Ryan, the London Customs Attache, told him at a conference in France that plaintiffs perhaps were controlling the case and receiving very high (five to ten percent) commissions on the cases they were working with Customs. Mr. Corcoran was worried that plaintiffs may have been using Customs as a vehicle to obtain commissions while Customs was making cases. Although Mr. Ryan's statement casts doubt on whether he imparted all this information to Corcoran, the court finds it probable that their conversation is the event that spurred Mr. Corcoran to investigate Houston III more closely when he returned to Washington.

Mr. Corcoran testified that he directed Marty White to instruct RDI Rigsby to ensure that Mr. Chadwick and the agents (Buselmeier and Winkler) were controlling the case and the manner in which the monies were paid. Mr. Corcoran knew there was no way he could control plaintiffs' dealings with Mr. Smalley, but he could and should control the monies going through Customs agents. He directed that if the suspect—that is, Mr. Smalley—paid the agents, that any money received by the agents should be seized and not turned over to plaintiffs. Corcoran did not want Customs agents involved in plaintiffs' payment. If any money was due plaintiffs, they could make claims to it later, that is, in court. Mr. Corcoran testified that he was not concerned if money passed directly from Mr. Smalley to plaintiffs. That sort of transaction was outside of Customs' control and would not taint the Service. If the mechanics of the transaction had been like those in Houston I, where the commission money went directly to plaintiffs without any Customs involvement, that would have been acceptable to Mr. Corcoran. This distinction did not come through clearly, however, in the December 14, 1981, letter to Mr. Rigsby signed by Mr. White,[5] which caused no little consternation in Houston.

Special Agent Gerry Dominick sent a memo on November 20, 1981, to Mr. Corcoran on Mr. White's behalf informing him that Mr. Dominick had explained to Mr. Chadwick that the funds to be paid by Smalley to plaintiffs were part of the whole payment for the merchandise and therefore were government monies that should be seized at the exchange. Though the memo states that the money would go first into plaintiffs' account and from there, less plaintiffs' commission, to

---

5. Mr. White testified that he had no knowledge of the contents or purposes of this letter or of Mr. Dominick's November 20 memo. Although he did sign the December 14 letter, he neither wrote nor signed the memo. In fact, he seemed to have very little knowledge of any aspect of Houston III, though Mr. Winkler testified that his only discussion of financial arrangements with headquarters personnel was one with Mr. White in which the percentage in "the original memorandum" was mentioned. Tr. at 946–47.

Customs' accounts, Dominick instructed Chadwick to seize all funds at the exchange, including plaintiffs' commission. Handwritten notes from a November 18, 1981, meeting show that Special Agent Meade Feild at headquarters also knew that plaintiffs would receive money drawn from the letter of credit, but does not indicate that he knew about their commission arrangement. The notes also state that Mr. Smalley would pay a commission of $1 million dollars at dockside, but the December 14 letter from headquarters to Houston indicates that Agent Winkler, in his undercover capacity, was to receive that commission. Plaintiffs testified that if they had known on November 20, 1981, that Customs would not allow Houston III to proceed to the point where money changed hands, they would not have continued the operation.

In April 1982, Mr. Smalley proposed to bribe the United States Attorney for the Eastern District of Texas, Bob Wortham, to facilitate the completion of the Houston III operation. Customs communicated Mr. Smalley's proposal to Mr. Wortham and, with the latter's authorized cooperation, attempted to set up the bribe. In May 1982, British authorities arrested and detained Mr. Smalley in the United Kingdom on charges of smuggling tank engines. Partly for this reason, and partly because plaintiffs and the Customs agents were reluctant to work with the FBI, the bribe attempt was never consummated.

Also in the spring of 1982, Mr. Corcoran again became concerned about Houston III. Assistant Chief Counsel Stuart Seidel had informed him that the defense in the Houston I civil forfeiture case claimed that Mr. Howard and Mr. Tucker controlled and actually ran the case, and had received several hundred thousand dollars—$600,000, as opposed to $100,000 as originally thought. Mr. Corcoran made inquiries of Marty White and his staff, who didn't know anything. He then sent Mr. Green and John Luksic to Houston to investigate. They reported back that plaintiffs had already received several hundred thousand dollars, and that Customs, specifically Mr. Chadwick, did not have direct control of the case. In May 1982, in response to these concerns and to lingering confusion over the mechanics of Houston III, Corcoran and Green sent Washington, D.C., SAC William Rudman to Texas to take over the investigation and to recommend whether Customs should terminate or continue the investigation. Mr. Rudman bypassed the usual chain of command; he reported directly to Mr. Corcoran and Mr. Green and, in turn, received reports directly from Mr. Buselmeier. Mr. Rigsby and Mr. Chadwick had no further involvement with Houston III after Mr. Rudman's arrival.

When Mr. Rudman arrived in Houston, Mr. Buselmeier appeared very distrustful and contemptuous of headquarters to Mr. Rudman. Buselmeier and Winkler gave Rudman a case file for Houston III containing only "two [or] three one-page memos and a few tapes" when he arrived in Houston to take over. Additional documentation of Houston III existed—enough that by July, special transportation arrangements were needed to get it to Washington; however, when Mr. Rudman arrived and requested to see the file, he was not shown this documentation. Mr. Buselmeier also did not want Mr. Rudman to talk directly with the informants. In spite of this reception, and his conclusion after interviewing plaintiffs that "Mr. Howard and Mr. Tucker directed the operation ..., that the agents were the followers and Mr. Howard and [Mr.] Tucker were the leaders," tr. at 621–22, Mr. Rudman recommended that the operation continue in spite of his prior inclination to shut it down.[6] Even so, Mr. Corcoran recalled that the arms transaction portion of Houston III began to wind down fairly quickly after Mr. Rudman took over in 1982. In July 1982, however, Mr. Corcoran moved to Enforcement from Border Operations and lost track of the details of the case.

After the failure of the bribe attempt in the summer of 1982, Mr. Rudman saw two options left in Houston III. The first was to

6. Mr. Howard testified that Mr. Rudman told him that Mr. Corcoran had sent Rudman specifically to shut down Houston III, but that he could find no reason to shut it down. Mr. Rudman testified that, though he may have made such a statement to Mr. Howard, those were not his complete instructions.

prosecute Mr. Smalley for the events that had already occurred in respect of the arms transaction. The second option was to "attempt to induce [Mr.] Smalley to become an informant [for Customs]."

During the summer of 1982, Mr. Rudman attended meetings in Washington to discuss the progress of Houston III. At these meetings were representatives of the Justice Department, the U.S. Attorney's Office, Customs, the FBI (once), and the Treasury Department. At the last of these meetings, in September 1982, despite Mr. Rudman's endorsement on Customs' behalf of the Houston III operation as clearly "winnable," the Department of Justice and the United States Attorney in Beaumont, Texas, determined not to prosecute Mr. Smalley for violations of the neutrality laws. This decision effectively terminated the sting operation against Mr. Smalley. The United States Attorney in Dallas ultimately prosecuted Mr. Smalley for conspiracy. After a trial in which plaintiffs testified, a jury found Mr. Smalley not guilty of all charges in February 1983.

On or about May 16, 1983, Customs voluntarily tendered $100,000 in cash into the registry of the United States District Court for the Northern District of Texas, Dallas Division. Plaintiff Gary Howard had delivered that $100,000 to Customs on or about October 27, 1981, during the Houston III investigation. The United States, through its authorized counsel, stipulated and agreed that Mr. Smalley and plaintiffs would divide the $100,000 equally between them.

On December 27, 1984—following oral discussions on October 26, 1984—plaintiffs' attorney submitted to Customs a letter requesting reimbursement of the expenses incurred in connection with the Houston III investigation. On or about January 2, 1986, Customs sent plaintiffs a letter denying their request for reimbursement. This litigation followed.

## DISCUSSION

### I. The Commission Agreement

#### A. The Agreement to Pursue the Houston III Operation to its "Logical Conclusion"

As the linchpin of their agreement with Customs, plaintiffs allege that Mr. Chadwick

bound the government to continue the Houston III investigation to its "logical conclusion" unless confronted with the inability to make a prosecutable case against Mr. Smalley. The court heard little testimony, however, regarding the existence of such a promise. In fact, Mr. Chadwick testified that anytime Customs wanted to shut down the operation, it could do so.

Even if the court accepts that Customs made a commitment to pursue the investigation to its "logical conclusion," that agreement would have no legal force or effect. At first blush, the "logical conclusion" of the Houston III operation would seem to have been the arrest, indictment, and prosecution of Mr. Smalley. Chief Judge Smith appeared to interpret "logical conclusion" to mean just that when he ruled earlier in this case that failure to prosecute could not give rise to an actionable breach of contract. *Howard v. United States,* 23 Cl.Ct. 432, 434 (1991).

■ Plaintiffs argued at trial, however, that the "logical conclusion" of Houston III was the consummation of the sting operation, that is, the exchange of funds from which plaintiffs were to receive their commission. Thus, argue plaintiffs, Customs' failure to pursue the operation to that point constituted a breach of contract. The court finds plaintiffs' proposed distinction between prosecution and investigation unpersuasive. The law enforcement functions of the executive branch have their roots in Article II's command to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The prosecutorial function is concomitant with the investigative function. *See Morrison v. Olson,* 487 U.S. 654, 671, 108 S.Ct. 2597, 2608–09, 101 L.Ed.2d 569 (1988); *id.* at 705, 108 S.Ct. at 2626–27 (Scalia, J., dissenting); *see also United States v. United States District Court,* 407 U.S. 297, 317, 92 S.Ct. 2125, 2136–37, 32 L.Ed.2d 752 (1972) (discussing the "investigative and prosecutorial duty"). The purpose of a criminal investigation is to obtain sufficient evidence against the perpetrator of a criminal act to permit

that perpetrator's successful prosecution; when the prosecutor determines not to prosecute the target of the investigation, that investigation loses its purpose. No legitimate reason then exists to continue the investigation. Any agreement that binds the government to continue a criminal investigation thus shorn of its public purpose must fail as contrary to public policy.

■ In this case, the Department of Justice and the U.S. Attorney for the Eastern District of Texas determined not to prosecute Mr. Smalley for violation of the neutrality laws.[7] At that point, the investigation had to and did cease. No agreement could force the government to continue the investigation or subject the government to liability for halting it.

■ Even assuming that such an agreement might comport with public policy, this court would have no power to second-guess the U.S. Attorney's implicit decision that the case was not prosecutable. The decision whether to prosecute is committed to the discretion of the executive branch. *See Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985); *Wayte v. United States,* 470 U.S. 598, 607,

105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985); *Buckley v. Valeo,* 424 U.S. 1, 138, 96 S.Ct. 612, 691, 46 L.Ed.2d 659 (1976); *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). Without the allegation of a constitutional violation, any attempt by this court to review that decision would violate the separation of powers laid down in the Constitution of the United States.

### B. The Agreement to Allow Plaintiffs to Retain a Commission

The court finds that plaintiffs did reach an agreement with Mr. Chadwick wherein the government would allow plaintiffs to retain a commission from whatever arms transaction they arranged with Mr. Smalley in Houston III. The court holds, however, that the agreement does not constitute a valid contract that binds the government.

#### 1. Formation

■ Because the commission was to be paid by Mr. Smalley, and not by the government, the government could not have promised that plaintiffs would receive a minimum commission, for the government had no con-

---

7. Plaintiffs implied that bad faith motivated the Justice Department's decision to terminate Houston III and not to prosecute Mr. Smalley. The weight of the evidence, however, indicates otherwise. Several legitimate reasons for terminating the investigation surfaced during trial. Mr. Rudman testified that after the final Houston III meeting in Washington in September 1982, representatives of the Justice Department told him that they had decided to shut down the Houston III investigation because of problems with the merits of the case. Mr. Rudman telephoned Mr. Howard and told him that the Justice Department—specifically Joseph Tafe, Marshall Jarrett, and AUSA Wes Rivers—had decided not to prosecute Mr. Smalley at that time. Mr. Rudman explained that the decision was based on DOJ's concern that key unrecorded conversations between plaintiffs and Mr. Smalley and the case's dependence on plaintiffs' goodwill might undermine the merits of the government's case. Finally, Mr. Smalley's ultimate acquittal of conspiracy charges stemming from his conduct in Houston III confirm the Justice Department's determination that problems existed with the case.

Plaintiffs also impute bad faith to Customs in the termination of the investigation. Again, however, the balance of the evidence shows that Customs supported efforts to prosecute the case.

Mr. Rudman testified that he had determined that Houston III was clearly winnable. After obtaining the concurrence of his superiors, Mr. Green and Mr. Corcoran, he advocated prosecution of the case on Customs' behalf. Mr. Rudman could not have advocated prosecution had not Mr. Corcoran and Mr. Green concurred. Plaintiffs presented no evidence to contradict this testimony.

Wes Rivers became the primary U.S. Attorney contact for Houston III in late November 1981. Even at that early date, he was concerned that insufficient documentation existed to enable his office to make a solid case against Mr. Smalley. Mr. Rivers represented the U.S. Attorney at the September 1982 meeting when Houston III was terminated. He testified that the DOJ attorneys present at the final meeting unanimously agreed that the case should not be prosecuted. They felt that it was poorly documented and that plaintiffs were not credible witnesses in that they were uncooperative and susceptible to impeachment because of their financial dealings. The attorneys were also concerned because the actual munitions violation had not occurred. They had only a marginal conspiracy case because, with the exception of a man known as Mr. Bizzell, everyone involved around Mr. Smalley was a law enforcement officer.

trol over the payment.[8] The only consideration that the government could have given would have been forbearance from seizing the commission as evidence or perhaps a promise to support plaintiffs' petition for return of the commission after seizure. Putting aside the question whether the government had the legal power to seize the funds, much testimony was devoted to showing that the government did not possess the physical power to seize the commission. Mr. Howard testified that he and Mr. Tucker were the first recipients of all the money that Mr. Smalley put into Houston III. That money went into plaintiffs' bank accounts, which they alone controlled; no Customs personnel had access to those accounts. Mr. Smalley was to handle the letters of credit. Upon the arrival of the arms at the shipping locations, Smalley would transfer the final payment from the letters of credit into plaintiffs' bank accounts; plaintiffs, in turn, would transfer the arms' sale price, less their commission, to Customs' front company account to pay for the weapons. Because the government could not have seized the commission, its promise not to do so held no value to plaintiffs and may not constitute valid consideration for plaintiffs' promise to carry out the sting operation.

■ More important, however, the court finds that a promise of a federal law enforcement agency to refrain from the exercise of its lawful duties in obtaining evidence for the prosecution of a suspected criminal as a matter of public policy cannot bind the agency. If such a promise were to bind Customs here, it would functionally delegate the control of a criminal investigation to the private obligors, Mr. Howard and Mr. Tucker. If, as plaintiffs' counsel asserted at trial, plaintiffs had an "arrangement with the government to let them earn the commission," a situation would have developed in which Customs, a federal law enforcement agency, essentially had bound itself not to interfere with *plaintiffs'* expectations from the sting. A contract that places a government agency in such a situation violates public policy by removing investigative, and thus prosecutorial, discretion from the hands of the government and placing it in those of private citizens. *See supra* § I.A.

## 2. Breach

■ Even if the court were persuaded that Customs had formed a contract with plaintiffs, the court finds that Customs did not breach the contract. First, the government did not breach by nonperformance because no present duty to perform its part of the agreement—that is, to allow plaintiffs to retain a commission—arose. Only if a completed arms transaction had occurred, coupled with the tender of a commission by Mr. Smalley, would the government's duty have arisen. Because the Justice Department decided to terminate Houston III, the arms transaction never occurred. As explained *supra* § I.A., the government retained nondelegable discretion as to the occurrence of the transaction that would have triggered its duty to perform; any commitment by the government to ensure the occurrence of the transaction is unenforceable and may not be a basis for a breach. In other words, plain-

8. Thus, any confusion over the exact amount or percentage of the commission seems irrelevant. Mr. Chadwick did not agree to pay plaintiffs a commission himself. Rather, he agreed to allow them to retain whatever commission they might negotiate with Mr. Smalley. In a similar vein, plaintiffs allege, as the last element of their agreement with Customs, a guarantee that they would retain a net profit of no less than $1 million dollars at the close of the Houston III operation. The court heard testimony from several witnesses that Mr. Chadwick, in response to plaintiffs' request for such a guarantee, told plaintiffs to make as much money as they could. This testimony indicates that no meeting of the minds sufficient to form a contract occurred. The words "make as much as you can" do not constitute a commitment to ensure that the addressee will, in fact, make as much as he wants. And even if the court found that the agreement satisfied the elements of a contract, Mr. Chadwick did not possess the requisite authority to commit $1 million dollars of the government's money to plaintiffs. *See infra* § II.B.1.

Furthermore, Mr. Tucker testified that if the government stopped the operation, the million dollar guarantee disappeared. The government would only owe plaintiffs whatever money they had expended in pursuit of Houston III. Based on Mr. Tucker's understanding of the agreement, because the government did in fact terminate the investigation before plaintiffs could earn a commission, the government could be liable for no more than expenses in this action.

tiffs' attempt to shift to the government the risk of the nonoccurrence of the transaction fails.

■ Although the government's actions in terminating the investigation do not constitute a breach, plaintiffs point to George Corcoran's instructions not to allow money to pass to plaintiffs, embodied in the December 14, 1981, letter signed by Mr. White ordering seizure of all monies in Houston III, as a breach of the duty of good faith and fair dealing, encompassing the duty not to hinder and the duty to disclose superior knowledge. These statements, without action in accordance with them, must, if a breach, constitute a breach by anticipatory repudiation. Mr. Howard testified that Agents Buselmeier and Winkler showed him the December 14 letter, which he viewed as a breach of Customs' agreement with him and Mr. Tucker. Mr. Howard stated that plaintiffs considered terminating their involvement in Houston III at that time, but decided to continue the operation based on the assurances of Agents Buselmeier and Winkler that no one paid any attention to Mr. White, the purported author of the letter, that the U.S. Attorney's office supported the contract, and that, because the U.S. government would never have control of the commission money at any time and would therefore have no power to seize it, nothing had really changed. It is a fair inference from plaintiffs' continued performance that they viewed the agents' assurances as adequate. Thus, plaintiffs did not at the time choose to treat the agreement as breached.

Plaintiffs next argue that Customs breached its duty of good faith and fair dealing, Restatement (Second) Contracts § 205 (1979), specifically its duties not to hinder plaintiffs' performance, *id.* § 205 cmt. d, and to disclose superior knowledge, *id.* §§ 161, 205 cmt. d (condemning "[s]ubterfuges and evasions"). The court finds neither theory persuasive.

It is true that "[t]he government must avoid actions that unreasonably cause delay or hindrance to contract performance." *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed.Cir.1993). Plaintiffs, however, produced no evidence that the government unreasonably interfered with their performance. Plaintiffs point to the conduct discussed above, that is, Mr. Corcoran's instructions to seize the funds in Houston III before they changed hands. Yet these instructions did not actively hinder plaintiffs in any way; they were as free as before to pursue the sting operation and, even when they learned of the instructions, they did continue to do so. The only government conduct that could be construed as hindering plaintiffs was the State Department's reluctance to authorize release of the weapons because of possible diplomatic ramifications relating to the Iran claims settlement. Plaintiffs do not rely on this action in making their hindrance argument, though, and even if they had, it is unlikely that the court would have found the State Department's concerns unreasonable in the aftermath of the Iran hostage crisis.

Plaintiffs' superior knowledge claim clearly fails. As discussed above, Customs, through agents Buselmeier and Winkler, did disclose the December 14 letter plaintiffs. *See Petrochem Servs., Inc. v. United States,* 837 F.2d 1076, 1079 (Fed.Cir.1988).

■ Plaintiffs also argue that the doctrine of frustration of purpose entitles them to recover from the government such that they are placed in the position they occupied before Houston III began. Although, as this court has recently stated, "unanticipated intervening events [may] so impair[ ] the purpose of the contract as to destroy the value of the promised performance," *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 248–49 (1993) (citing Restatement (Second) Contracts § 265), the doctrine is inapplicable to this case. The parties plainly anticipated that Customs might refuse to allow plaintiffs to keep a commission in Houston III; if no foreseeable chance existed that Customs would do so, then plaintiffs would have had no logical reason to request an agreement otherwise.

■ Mr. Corcoran's instruction to seize all the funds at the time of the transaction appears to be based not on bad faith, but on a misunderstanding of the facts regarding the Houston III transaction. The communications from Houston to headquarters, par-

ticularly Mr. Chadwick's July 20, 1981, memo, paint a misleading picture of the mechanics of Houston III. Not until January 1982, in Mr. Buselmeier's letter, did headquarters receive written documentation of what this court finds to be the actual mechanics of the transaction.

On July 20, 1981, Mr. Chadwick sent a memo through his superior, Mr. Rigsby, to headquarters.[9] In the memo, Mr. Chadwick outlined the Houston III operation. He indicates that, should the operation proceed, Customs would "draw every penny of the violators' money into the hands of the United States Government," PX14 at 2, and that "prime mover"—Mr. Smalley—"would cause funds (covering each shipment's cost) to be transferred into [Customs'] front company bank account as he received each invoice." *Id.* at 5; *see id.* at 6. Mr. Chadwick goes on to state that Customs and the government "have not incurred any expenses—it has all been paid for with the violator's funds."

Most important, in discussing the commissions in the case, Mr. Chadwick mentions a two percent commission for Mr. Winkler and a ten percent commission for Mr. Smalley, but does not mention a commission for plaintiffs. In fact, plaintiffs maintain a conspicuously low profile in the memo. Confidential sources are discussed only two or three times in the context of putting Customs in contact with Smalley. Their involvement with the financial aspects of the operation is never mentioned. Because this is the earliest and most detailed information received by headquarters regarding Houston III, it is probable that headquarters personnel, including Mr. Corcoran, Mr. Green, and Mr. White, based their knowledge and perceptions of Houston III on its contents. The ambiguities contained therein regarding plaintiffs' role in the investigation and financial arrangements may have led to later misunderstandings by Mr. Corcoran and his associates.

In particular, Mr. Chadwick's discussion of Mr. Smalley arranging for money to go into Customs' account, *supra,* could quite logically

have led Mr. Corcoran to believe that the money would travel from Mr. Smalley to Customs to plaintiffs. Furthermore, the last paragraph of Mr. Chadwick's memo states that "the investigation [will] conclude with the seizure of the weapons, vessel(s), *and payoff commissions* involved...." PX14 at 7. Mr. Corcoran plausibly might have inferred from this statement that plaintiffs' commission, though not mentioned in the memo, would be part of the money changing hands at the culmination of the case. Although plaintiffs clearly were not responsible for the miscommunication between Houston and Washington, they may not take advantage of it as an indication of bad faith or the like on the part of Customs headquarters.

## II. The Expense Reimbursement Agreement

### A. Evidence of an express expense reimbursement agreement.

■ To establish the existence of an express contract, plaintiffs must show the following elements required by common law: "mutuality of intent, lack of ambiguity in offer and acceptance, and consideration." *Kentucky v. United States,* 27 Fed.Cl. 173, 176 (1992) (citing *Fincke v. United States,* 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982)). Plaintiffs have not met this burden.

Plaintiffs themselves are the only witnesses who testified that the government expressly agreed to reimburse their expenses if Customs prematurely terminated Houston III. George Petrie, an employee of plaintiffs during Houston III, testified that Mr. Winkler asked him to prepare an accounting of plaintiffs' expenses, but did not indicate whether Customs had an obligation to reimburse them. Mr. Tucker also testified that Mr. Winkler asked *him* to prepare a list of expenses in late 1982. Mr. Petrie testified that "You had to more or less take the word of the agency that they were going to pay you."

■ Each Customs agent with whom plaintiffs had contact testified that he had

---

9. Although the July 20 memo is addressed to Mr. Rigsby, Mr. Chadwick received confirmation from Mr. White that his July 20, 1981, memo had

reached headquarters; Mr. White told him that he thought it was a joke.

not promised them that Customs would reimburse their expenses. Mr. Chadwick, who allegedly had the first financial discussions with plaintiffs, testified that he made no representation to them that Customs would reimburse their expenses. Mr. Rudman, who took over Houston III from Mr. Chadwick, did not recall telling plaintiffs that Customs would pay their expenses. He testified further that he could not have done so because he "had no authority" to do so. Even Mr. Winkler, who worked with plaintiffs on almost a daily basis during Houston III, testified that he never told plaintiffs that Customs would reimburse their expenses if Customs shut down the investigation or only brought conspiracy charges.[10] The fact that AUSA Rivers, who participated in the decision not to prosecute Mr. Smalley, testified that no one told him that the government would have to reimburse plaintiffs if the government decided not to prosecute is also some evidence that no such agreement existed.

Jack Compton testified that Mr. Chadwick told him in 1984 that plaintiffs were going to lose the money they had expended on Houston III because they had not been able to take it to completion. Mr. Compton further testified that Mr. Chadwick told him that Customs had made a representation that plaintiffs would be paid, but was not going to honor it. Mr. Compton had these conversations with Mr. Chadwick before the government paid plaintiffs the $250,000 moiety in 1985. Mr. Chadwick testified that he believed that, when he told Mr. Compton in 1984 that the government should pay plaintiffs, he was talking about the moiety award, the application for which had been delayed for "a year and a half" at that time.

Customs internal affairs agent Arthur Rohr testified that, in an interview, Mr. Howard mentioned receiving his normal percentage, perhaps five percent, for his work on Houston III. He did not mention an agreement for reimbursement of expenses. Agent Michael Modrak corroborated Mr. Rohr's recollection of the interview. Plaintiffs took two tacks to try to rebut this testimony. First, Mr. Howard testified that he did tell the internal affairs agents about the expense reimbursement agreement. Second, plaintiffs implied that Mr. Howard believed that the agents would interview him more than once, and that if he did not discuss the expense agreement, he did so because he was saving it for a later interview. Even if Mr. Howard thought that Customs would conduct multiple interviews, the court can conceive of no reason for him to omit from his discussion of financial arrangements at the first interview the alleged expense agreement. Mr. Howard also testified that he suggested that Customs give him and Mr. Tucker the weapons seized in Houston I so they could sell them to cover their expenses. Although this evidence suggests that plaintiffs were looking for a way to recoup expenses, it also indicates that plaintiffs did not have an expectation that Customs would be the source of that recoupment.

Furthermore, the contemporaneous written evidence that discusses the financial arrangements in Houston III does not mention an expense agreement, and sometimes it indicates circumstantially the absence of one. Mr. Chadwick's July 20, 1981, memo to headquarters does not, in its discussion of finances, mention any arrangement to reimburse plaintiffs' expenses. The December 14, 1981, letter from headquarters does not refer to expenses when discussing arrangements for paying informants. A January 29, 1985, letter from Keith Adkinson, plaintiffs' former attorney, refers to the December 14 letter as "accurately summariz[ing] the agreement between Customs, Justice, and [Howard and Tucker]." DX31 at 1. Mr. Buselmeier's 1/6/82 line-by-line refutation of the December 14 letter states that Howard and Tucker had "paid expenses for themselves, the suspect, and others in a way that [the] service could not have hoped to match." PX27 at 3–4. Yet even when addressing the possibility of premature termination of the investigation, Mr. Buselmeier's memo does not mention that the government might have a duty to reimburse those expenses. In addition, the moiety request drafted by Mr. Chadwick for Mr. Rigsby's signature cites expenses incurred in furtherance of Houston

---

10. Mr. Buselmeier passed away before trial.

III as a reason to give plaintiffs a large moiety award for Houston I and goes on to state expressly that Customs had only reimbursed a small amount of those expenses. Mr. Chadwick's discussion of plaintiffs' Houston III expenses as a ground for increasing the amount of their moiety is inconsistent with a belief on his part that Customs would reimburse those expenses on a basis independent of that moiety.

Documents generated immediately following Houston III also · discuss the financial arrangements for the operation, but do not mention an expense agreement. When plaintiffs filed suit in the Northern District of Texas for the return of the $100,000 paid to Mr. Winkler, the complaint states that the December 14 headquarters letter accurately reflected plaintiffs' compensation agreement with Customs. Although Mr. Howard testified that the complaint only referred to the "compensation" arrangement, which did not include expense reimbursement, the court still finds its absence probative.

The only written evidence indicating an expense agreement is Mr. Howard's May 5, 1983, affidavit, which was probably modified after its initial drafting.[11] Mr. Tucker testified that he knew of no writing by Mr. Tucker or Mr. Howard, other than Mr. Howard's affidavit, that referred to or documented an expense agreement between plaintiffs and Customs. The court concludes that no express contract for reimbursement was created.

### B. No Implied-in-Fact Contract for Expense Reimbursement was Created

■■■ Plaintiffs assert that, if no express contract to reimburse their expenses was formed, then an implied-in-fact contract to reimburse them was created by the facts and circumstances of the operation. To prove the existence of an implied-in-fact contract, plaintiffs must show the same elements re-

quired to constitute an express contract, that is, mutuality of intent, consideration, and lack of ambiguity in offer and acceptance. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990) (citing cases). Furthermore, "[w]hen the United States is a party, a fourth requirement is added: the [g]overnment representative 'whose conduct is relied upon must have actual authority to bind the government in contract.'" *Id.* (quoting *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947))). Even if plaintiffs could establish the first three elements of an implied-in-fact contract, they fail as to the fourth.

#### 1. Authority

■■■ Plaintiffs have not shown, nor could they, that any official with whom they dealt, and upon whose conduct they therefore might rely, possessed the requisite actual authority to "bind the government in contract." *See H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The requisite authority may be either express or implied. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). Plaintiffs bear the burden of proof with respect to authority. *Kania v. United States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Miller Elevator Co. v. United States,* 30 Fed.Cl. 662, 693–95 (1994).

#### a. Express authority

■■■ A government employee possesses express authority to bind the government only when the Constitution, a statute, or a regulation grants it in unambiguous terms. Plaintiff presented no evidence of any source of express authority for any Customs official

---

**11.** Customs internal affairs agent Michael Modrak testified that Mr. Howard modified the affidavit based on his interview with internal affairs before he signed it. The modification, according to Agent Modrak, consisted of adding the only sentence in the affidavit that mentioned an ex-

pense agreement. *Id.* Mr. Howard testified on rebuttal that Agent Modrak's testimony about changing the contents of his affidavit to include a sentence about expenses was not true. On cross-examination, however, Mr. Howard stated that

to bind the government in contract.[12] On the other hand, defendant introduced into evidence those portions of the Customs Special Agent Handbook dealing with confidential sources. This handbook was in effect during Houston I and III in 1981–82. It establishes the authority of Customs agents to make payments to confidential sources such as plaintiffs in this case. It lists four methods of paying confidential informants: (1) award of compensation (moiety) of 25% of the amount seized, but not to exceed $50,000 (amended in 1984 to $250,000), Handbook § 8.A.(1); (2) purchase of information, with a $2500 limit per investigative case on an RDI's authority, delegable to his SACs, and a $10,000 limit on the authority of the Assistant Commissioner, id. § 8.B.; (3) purchase of evidence, with a $2500 limit per investigative case on an RDI's, delegable to his SACs, and a $10,000 limit on the authority of the Assistant Commissioner, id. § 8.C.; and (4) payment for travel expenses, with a $35 per day limit on subsistence and a limit on travel set by the Customs accounting manual and the individual RDI, id. § 8.D.(2). Mr. Chadwick testified that, in the Houston region, he had no authority to reimburse travel expenses unless they received prior approval. The Handbook goes on to require that detailed information be submitted to headquarters to obtain authorization for any purchase of information or evidence "totalling more than $2500." Id. § 8.F.

Payments for confidential sources came out of the interest fund. The government also introduced a portion of a Customs manual dated October 2, 1979, governing the payment of money to confidential sources from interest funds. This manual restated the $2500 limits on payments by principal field officers (RDIs) and their delegates for purchase of information or evidence and made it clear that these limits also applied to per diem allowances and travel expenses. Manu-

al § 5363.5.A.1.a.–d. Furthermore, the manual limited the independent authority of even the Assistant Commissioner for Border Operations and the Commissioner. These officials could only authorize payments of up to $2500 on the own authority. They had authority to recommend payments of amounts exceeding $2500, but "all cash disbursements exceeding $2500 in one lump sum [required the advance approval of] the Treasury Chief Disbursing Officer." Id. § 5363.5.A.1.a.

Although plaintiffs testified that Mr. Chadwick and Mr. Rudman told the former that they had the requisite authority, all of the Customs agents who testified stated that no one with authority approved the agreement. Mr. Corcoran did not inquire about any agreements between Customs and plaintiffs because he would have had to have approved any legitimate agreement that provided for plaintiffs' receipt of a substantial amount of money from Customs and he had not done so.

According to Mr. Rudman, Customs did not use contracting officers or issue warrants to pay expenses for confidential informants. This evidence clearly indicates that some Customs agents possessed some authority to pay money to informants. It does not, however, show the source of that authority or any limits that might condition the grant of authority. Mr. Rudman explained, consistent with the handbook, that if a SAC had a big case that required spending more than his budget allowed, he could go to his RDI, who would in turn speak to Mr. Corcoran or Mr. Green and ask for more money. If Mr. Green or Mr. Corcoran approved, then someone would put in a written authorization for transfer of the funds from the financial department to the SAC office.

Finally, Mr. Rudman, Mr. Chadwick, and Mr. Winkler each testified that he had no authority to promise plaintiffs that Customs

---

he did not recall whether he changed his affidavit after it was typed the first time.

12. Because plaintiffs introduced no evidence of authority, and thus failed to carry their burden of proof, the court could not find that Customs officials possessed such authority even in the absence of defendant's abundant evidence to the contrary. *Kania*, 227 Ct.Cl. at 465, 650 F.2d at

268. Plaintiffs' "due process" objection to the government's use of the unpublished handbook is therefore moot. It is not the limitations in the Customs handbook that preclude a finding of authority; even without the handbook, plaintiffs would be able to point to *no* source granting authority to the Customs agents to enter into the alleged agreement.

would reimburse all their expenses for Houston III. Given the absence of evidence of the requisite authority and the weight of the evidence to the contrary, the court finds that no Customs official with whom plaintiffs dealt possessed the express authority to bind the government to pay plaintiffs' expenses.

### b. Implied authority

▮▮▮▮ Plaintiffs also assert that, even if no Customs official with express authority contracted with plaintiffs, the Customs officials with whom plaintiffs did discuss finances possessed implied authority to contract on behalf of the government. " 'Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.' " *H. Landau & Co. v. United States,* 886 F.2d at 324 (quoting John Cibinic & Ralph C. Nash, Formation of Government Contracts 43 (1982)). Thus, the court must inquire as to the duties of Customs agents from the level of SAC on down. Although the parties presented little direct evidence on this point, the court infers that those duties consist primarily in the investigation of violations of the customs laws and the apprehension of the violators. At the SAC level, duties also include the supervision of the field office and its personnel, the planning and coordination of operations against suspected violators. Plainly, the handling of confidential informants helps the agent in the pursuit of his investigative duties. Furthermore, the informant will rarely cooperate without some form of compensation; the agent with whom he deals is the most likely person to compensate him. But, just as this situation does not grant an agent—or a SAC—implied authority to enter into a plea agreement with an informant who seeks to avoid criminal prosecution without the approval of the U.S. Attorney, *see supra* § I.A., it does not grant him authority to form other types of binding contracts with an informant without proper approval. Thus, no agent with whom plaintiffs dealt possessed either the express or implied authority to bind the government.[13]

### 2. Ratification

▮▮▮▮ Plaintiffs argue that, even if the lower level agents with whom they dealt lacked authority, that senior Customs officials, including Mr. Rudman, ratified their agreement. Yet no official higher in rank than a SAC is alleged even to have communicated with plaintiffs regarding Houston III. Silence or inaction on the part of authorized officials without more does not constitute ratification. Mr. Rudman did not recall any discussion of the financial arrangements with plaintiffs. Even if he had attempted to ratify the alleged agreement, however, such an action would have had no effect. Mr. Rudman's special mission gave him no more authority than that which he already possessed as a SAC. Just as a SAC lacks authority to enter into an agreement such as the one alleged here, a SAC lacks authority to ratify such an agreement.

▮▮▮▮ Neither can plaintiffs invoke the doctrine of institutional ratification as set forth in *Silverman v. United States,* 230 Ct.Cl. 701, 679 F.2d 865 (1982). In *Silverman,* an official of the Federal Trade Commission ("FTC") "who had authority to approve vouchers for payment for goods and services", *City of El Centro,* 922 F.2d at 821, expressly promised to pay plaintiff for his services if he performed them. Plaintiff then performed his service, from which conferred a benefit upon the FTC. The Court of Claims held that, "[b]y accepting the benefits *flowing from the senior FTC official's promise* of payment, the FTC ratified such promise and was bound by it." *Silverman,* 230 Ct.Cl. at 710, 679 F.2d at 870 (emphasis added); *see also United States v. Amdahl*

---

**13.** Under this analysis, "plaintiffs cannot employ the doctrine of equitable estoppel to establish an implied-in-fact contract. 'In equitable estoppel cases, the law requires that plaintiff prove that the official whose act(s) is relied upon had the requisite authority.' " *Miles Farm Supply, Inc. v. United States,* 14 Cl.Ct. 753, 757 (1988) (quoting *Hazeltine Corp. v. United States,* 10 Cl.Ct. 417, 440 (1986), *aff'd,* 820 F.2d 1190 (Fed.Cir.1987)).

The government cannot be estopped to deny the existence of a contract based on the alleged representations of unauthorized officials such as the Customs agents involved in this case. To the extent that plaintiffs' argument sounds in promissory estoppel rather than equitable estoppel, this court has no jurisdiction to consider it. *American Maritime Transp., Inc. v. United States,* 18 Cl.Ct. 283, 292, (1989).

*Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986) (allowing claimant who relied on unauthorized express contract to recover from government in *quantum meruit* ).

In the case at bar, however, no express promise, authorized or unauthorized, has been shown. The Federal Circuit expressly declined to extend the doctrine of institutional ratification to situations in which no government official made an express promise to compensate the claimant. *City of El Centro,* 922 F.2d at 821. Furthermore, though plaintiffs elicited testimony that the government had received a benefit from Houston III in the form of intelligence and knowhow, the court is not convinced that, even if the agreement existed as plaintiff alleged, the government bargained for that particular benefit. If the government bargained for anything, it was assistance with the sting of Mr. Smalley, an event that never occurred. Thus, plaintiffs cannot prevail based on the theory of institutional ratification.

### CONCLUSION

 For the reasons stated above, the court denies plaintiffs' claims. The clandestine aspects of the operation not only made plaintiffs legitimately concerned about their own safety from retribution by the target of the sting and his clients, it created within the sting group a siege mentality that made it suspicious of and hostile to legitimate scrutiny. It is the very absence of this scrutiny that ultimately precludes the finding of authority and formality requisite to the creation of enforceable rights.[14] The Clerk is directed to enter judgment dismissing the complaint. No costs.

14. Plaintiffs also assert that the government took their property without just compensation in violation of the fifth amendment. This argument lacks merit. First, when .a party alleges, as plaintiffs do here, an entitlement to compensation created by a contractual arrangement, any right to compensation depends entirely on the enforceability of that agreement. *See Marathon Oil Co. v. United States,* 16 Cl.Ct. 332, 338–39 (1989) (quoting *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978)). Second, plaintiffs have failed to allege the depriva-tion of a property interest. Though contractual rights may constitute property under the fifth amendment, *Hedstrom Lumber Co. v. United States,* 7 Cl.Ct. 16, 27 (1984), that obviously presupposes the existence of an enforceable contract. Furthermore, the mere "fact" of the expenditure of time and money does not become property independently protectable under the fifth amendment, although it may create rights in whatever goods or services the expenditure procured.