C. Carlos GARZA, Jr., Anthony DePonce, and Johnie Wise

v.

The UNITED STATES.

No. 234–88C.

United States Court of Federal Claims.

July 18, 1995.

Herbert R. Rubenstein, Washington, DC, attorney of record, for plaintiff.

Harold D. Lester, Jr., Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Deborah A. Brinley, United States Dept. of Justice, Washington, DC, and Catherine Parker–Harrison, United States Customs Service, Houston, TX, of counsel.

**OPINION**

YOCK, Judge.

In this breach of contract action, the plaintiffs allege that the United States Customs Service ("the Customs Service" or "Customs") engaged them to assist in apprehending alleged drug smugglers through a maritime sting operation. The Court heard testimony and argument during a week of trial and carefully read the parties' post-trial submissions. Although the Court believes that the plaintiffs acted in good faith and with respectable intentions, this Court finds that they have not established a legal entitlement to relief. This Court finds that no enforceable contract existed between the plaintiffs and the defendant and that, even if an agreement had existed as alleged, the Govern-

ment's conduct would not have constituted a breach thereof.

### Factual Background

Throughout 1984, 1985, and 1986, Mr. William Cabe was employed by the United States Customs Service as a Customs Patrol Officer (CPO) in Brownsville, Texas. His duties consisted mainly of patrolling the Rio Grande River and the seaport to prevent contraband from entering the country. Narcotics made up a large portion of the contraband sought to be excluded by the Customs Service.

CPO Cabe reported to the Supervising Customs Patrol Officers ("SCPOs") in the Brownsville office. Tr. at 574; Def.Exh. 30 at 11.[1] In 1984, Mr. Michael Waggoner and Mr. R.C. Williams were the two SCPOs in the Brownsville office with supervisory duties over Officer Cabe and other CPOs. SCPO Williams retired on December 31, 1984. The direct supervisor of Officers Waggoner and Williams was the Station Supervisor, Mr. Guadalupe Alderete. Overseeing Officer Alderete was Mr. Arthur Cser, who was originally the District Director of Patrol in Laredo, Texas. In early 1985, Mr. Cser was redesignated a Senior Special Agent in San Antonio, Texas, as part of an ongoing consolidation of offices within Customs at the time. Mr. Cser's immediate supervisor was Special Agent in Charge Don Ackerman. Mr. Ackerman in turn reported to Mr. Donald Turnbaugh, the Assistant Regional Commissioner for Enforcement in Houston, Texas. Tr. at 658, 713.

Early in 1984, Mr. Johnie Wise met with Officer Cabe to discuss the possibility of cooperating on a sting operation. All of the plaintiffs insist that Officer Cabe approached Mr. Wise in February or March of 1984, while Customs personnel recall, and several official Customs documents record, that Mr. Wise first contacted Officer Cabe and his supervisor, Officer Waggoner, on or around April 11, 1984, in order to request a meeting. In any event, the three men discussed the idea of forming a private, legitimate maritime shipping corporation and utilizing that business, at least in part, as a front for Customs undercover operations involving smuggling large quantities of marijuana. Def.Exh. 9b. This plan eventually became known as Operation Sealift.

Mr. Wise had been a sea captain for many years, and he was to provide the technical expertise for buying and operating the ship. Mr. Wise related his ideas to Mr. Anthony DePonce, a real estate developer who had connections within the Customs Service and other governmental agencies. Mr. DePonce agreed to serve as director of the shipping company both in its commercial operations and its involvement in the sting operation.

For financial backing, Mr. DePonce and Mr. Wise contacted Mr. C. Carlos Garza, a rancher and landowner from Raymondville, Texas, who, they believed, could raise the necessary capital for such an operation. Mr. Garza, who had a degree in mechanical and aerospace engineering, had worked for several years with the Federal Government on the Saturn and Apollo space missions. In 1970, Mr. Garza organized a national bank charter in Houston, Texas, to further minority banking. By the late 1970s, Mr. Garza had started his own company, which patented and manufactured furniture, bricks, and casting irons. After a couple of years, Mr. Garza sold off his business and took over his father's ranch holdings near Raymondville, Texas, about 70 miles north of Brownsville. Mr. Garza continues to own and develop property throughout South Texas, especially near the mouth of the Rio Grande River. In 1984, Mr. Garza was willing to invest in Operation Sealift.

Initially, Mr. Garza "scoffed" in disbelief at the idea during his first meeting with Mr. DePonce in early 1984. At the second meeting, Mr. Garza met CPO Cabe and provided him with his personal information for a background security check. Mr. Garza himself made inquiries concerning CPO Cabe, Mr. Wise, and Mr. DePonce, and even followed them around as far away as the Federal

---

1. This Opinion uses "Tr." to refer to the transcript from the trial held November 15 through 18, November 22, and December 1, 1994. "Pl. Exh." refers to a plaintiffs' exhibit, and "Def.Exh." refers to a defendant's exhibit.

**4**

Building in Houston, until he satisfied himself that these men were honest, legitimate Customs Service officers and associates. From the beginning, Mr. Garza also sought assurances from Officers Waggoner and Williams that they had authorization to proceed with such an operation. Both of them assured him that authorization to hammer out an operational plan had been obtained. SCPO Williams mentioned to the plaintiffs that his office had informed Mr. Arthur Cser (his supervisor's boss), of the operation, and he described very similar operations which had occurred in nearby jurisdictions. Mr. DePonce made inquiries of his own, such as checking with his friend, Mr. Arturo Lopez, of the United States Coast Guard, whose help the Customs Service would need in order to execute Operation Sealift.

At another meeting Mr. DePonce, CPO Cabe and SCPO Waggoner discussed what the proposed sting operation would entail. One of the few points upon which all witnesses agreed was that it was the plaintiffs who were responsible for buying a ship, starting a commercial shipping enterprise, and making the ship available for the Customs Service's sting operations. Customs could not afford a large ship and crew, and Officers Cabe and Waggoner feared that the more closely involved Customs agents were, the easier a criminal defendant could claim entrapment. Because the Customs Service would not be responsible for purchasing the ship, its registration, or its licensing, the Customs Service did not dictate the size, cost, nationality, or any other specification for the vessel.

Over all other aspects of the arrangement, the parties strongly disagree. According to the plaintiffs, the Customs Service was responsible for arranging for at least one shipment of marijuana. Supposedly, the Customs Service would use its contacts in South Texas and in South America to entice drug suppliers in Colombia, or some similar point of origin, to ship 100 tons of marijuana using the plaintiffs' ship. The plaintiffs claim that Officers Cabe and Waggoner told them that drug dealers typically pay half the transport fees up front and half upon delivery, and that the plaintiffs could keep this so-called up-front payment as compensation. This up-front transport fee was the financial incentive for investing in such an expensive scheme. Tr. at 879. The plaintiffs allege that the Customs officers specifically quoted customary transport fees of $30 to $35 per pound, resulting in an up-front payment of approximately $3 million for a 100–ton operation. Tr. at 165, 193. Payments of this magnitude would serve as a hefty return on the plaintiffs' investment.

Mr. Garza testified that Officers Cabe and Waggoner both told him these details as early as their first meeting. Tr. at 193, 886. Furthermore, the plaintiffs offered the testimony of SCPO R.C. Williams, who verified that his colleagues anticipated making numerous shipments and, consequently, several arrests.

> [I]t was hoped to pull at least two loads and possibly three * * * depending on how they worked out. In other words, when the ship came in, the marijuana was to be off loaded onto tractor trailers who would take it out of our area. And it would be busted down the road. The ship would be clear and gone. The ship would still be clean.

Tr. at 109. The plaintiffs expected at least one Customs employee, probably Officer Cabe, to journey along on the ship for security, with other agents possibly boarding at some other Gulf of Mexico ports.

Although the cost of the ship was not a part of the agreement, all three plaintiffs testified that Officers Cabe and Waggoner informed them that if they bought a ship, the Customs Service would "help" with expenses such as crew wages and fuel. There was no discussion of limits on how much the plaintiffs could spend, although Mr. Garza believes he once heard the figure of $10,000 per crew member. Generally, the plaintiffs thought that expenses would be approved or denied as they were incurred or as receipts were turned in.

The primary compensation, however, was to come directly from the smugglers in the form of the up-front payment. SCPO R.C. Williams testified that even though he was not directly involved in the sting operation, he would occasionally review office memoran-

da, and that he was fully aware that CPO Cabe planned for plaintiffs to keep the money they received as up-front transport fees from the drug smugglers.

The defendant strongly disagrees with this version of the proposed arrangement. The Government contended at trial that it was Mr. DePonce who had connections in Colombia, and that Mr. DePonce would be the one to provide the names of potential buyers and sellers, informing the Customs Service all the while of his progress. The Customs Service, under this arrangement, would merely observe and aid in the unloading of the marijuana either in Brownsville, in nearby Port Isabel, or slightly offshore. Witnesses at trial for the Customs Service testified that Customs did not have the authority to undertake international interdiction operations, which would necessarily involve the United States Drug Enforcement Agency (DEA). Customs could, however, conduct smaller operations within the borders of the United States.

The Government further argued at trial that neither CPO Cabe nor SCPO Waggoner, nor any other Customs Service employee for that matter, ever promised to compensate the plaintiffs for their expenses. The Government maintains that the officers simply informed the plaintiffs of standard moiety awards, under 19 U.S.C. § 1619 (1982), which are given to informants who help the Customs Service make seizures or arrests. Additionally, the Government asserts that no Customs Service employee ever suggested that the plaintiffs could actually keep any up-front transport fees, since such money would be necessarily confiscated as criminal evidence.

If any agreement or contract arose, it was oral. All parties agree there was no physical contract, no piece of paper with the specific terms of the agreement reduced to writing and signed by all. Officers Cabe and Waggoner did, however, prepare draft proposals for Operation Sealift, detailing what Customs would do if the operation progressed, in order to inform their station supervisor of what the arrangement would be and what had been discussed with the plaintiffs. One of these draft proposals was submitted as evidence during the trial. Def.Exh. 9e. It contained a project overview outlining how contact had been made with informants and how the Customs Service would use the informants' ship for multiple sting operations. Customs employees would help unload twenty to fifty tons of marijuana, and would execute numerous arrests. The anticipated starting date was listed as May 1984. The document also contained a budget plan, not in order to reimburse any of the plaintiffs, but to estimate how much Customs employee overtime, equipment, and other expenses would cost.

At one late night meeting at Mr. DePonce's house, Officer Cabe showed what was called a final draft of the document to Mr. Garza in the headlights of his truck as Mr. Garza was arriving and CPO Cabe was leaving. Tr. at 196, 893. Mr. Garza had requested that CPO Cabe add a few items and amend the draft proposal to ensure that everything was approved and that neither Mr. Garza nor his vessel would be arrested. Mr. Garza asked CPO Cabe for a copy but was told that CPO Cabe would keep it in his safe at the Customs station. Mr. Garza also asked that a copy be sent to a federal judge, but no copy was ever sent. Mr. Garza did not sign or initial the document, but he remembers it having a "formal" style.

What the final document contained was again the subject of much debate at trial. Because the plaintiffs were not able to pinpoint major discrepancies between that document viewed at Mr. DePonce's home and the version accepted into evidence, this Court concludes that the two versions are extremely similar. The Court finds that the document did not promise to reimburse the plaintiffs' expenses, especially to the extent sought in this action. The document did not contain the names of Mr. Garza or the other plaintiffs because CPO Cabe considered them to be confidential informants.

After the initial planning and introductions, many meetings ensued during the spring of 1984, and the plaintiffs kept Officer Cabe appraised of their activities. Official Customs memoranda show that by the end of April 1984, the plaintiffs had found a warehouse in Brownsville for possible leasing, and

had made plans to fly to Miami, Florida, to inspect a ship, the *M/V Katie Lynn,* for possible purchase. Def.Exh. 9b. On or around April 24, 1984, Officers Cabe and Waggoner informed their supervisor, Mr. Guadalupe Alderete, of the meetings and discussions, and he asked them to open a case file on Operation Sealift and to document contacts with the plaintiffs.

During May of 1984, CPO Cabe continued his background check of Mr. Garza and the others and also investigated the legal status of the *M/V Katie Lynn.* Def.Exh. 9c & 9d. CPO Cabe visited Mr. Garza at his ranch, for example, and took pictures of his land holdings as proof of Mr. Garza's financial stature. The plaintiffs eventually rejected the *M/V Katie Lynn* due to its age, condition, and price, and continued searching for an appropriate vessel. Because ships were selling for more than Mr. Garza could provide, he enlisted the financial aid of Mr. Mario Arrieta, a Mexican businessman who was also approved by CPO Cabe.

After a few more weeks, Officer Cabe remarked to his supervisor that despite a lot of talk, nothing concrete had materialized out of Operation Sealift. Further, Officer Cabe told Station Supervisor Alderete "that DePonce was coming up with all sorts of ideas and more or less wanted to control the direction of the case." Def.Exh. 9f. Moreover, Mr. DePonce was telephoning Officer Cabe often and at all hours, and was beginning to frighten him. Mr. DePonce himself claimed repeatedly that he maintained almost daily contact with Officer Cabe while he searched for a ship both in Europe and in the Caribbean. Tr. at 900–02. Agent Alderete instructed CPO Cabe to close the case soon, since no positive results had taken shape. Agent Alderete testified that he never met the plaintiffs, and certainly never authorized any monies to be advanced or obligated to them. *Id.*

The plaintiffs traveled to various locations in search of an appropriate ship and in search of financing. Mr. Wise and Mr. Arrieta discovered a vessel in Europe which was affordable and yet capable of meeting their needs. They purchased the 820–ton, 220–foot long vessel in Antwerp, Belgium, for $105,000. Next, in Rotterdam, The Netherlands, they repaired it enough to register it, often referred to as "putting it back in class." The plaintiffs scouted around for cargo to carry back to North America, in order to pay for the voyage, but found none worth the expense. For a few months, Mr. Wise captained the ship between ports around the North Sea. Eventually, they gave up on bringing the ship to the Caribbean, and left it in Europe to be sold.

At the end of 1984, Mr. Garza gathered all the receipts and bills from the travels of the plaintiffs in search of a ship, such as for airline tickets, hotels, and meals, and gave them to Mr. DePonce to forward to Officer Cabe for reimbursement. Tr. at 230. These bills, totalling approximately $20,000, were the only ones ever handed over to CPO Cabe or any other Customs official. Officer Cabe told the plaintiffs that they would not receive any money until the successful completion of the operation. The plaintiffs interpreted this to mean that, in the end, they would be reimbursed, whereas Officer Cabe was most likely referring to moieties and not to reimbursements.

In March of 1985, Mr. Garza, with Mr. DePonce present, purchased a vessel called the *Devon I* in San Juan, Puerto Rico, and took it to the Dominican Republic for repairs and upgrading. The legal owner of the vessel was actually the Frosty Trade Company, formed and owned by the plaintiffs. Tr. at 1075–76, 1080–82. The vessel was certified in July 1985, registered in Tortola, British West Indies, and renamed the *M/V El Frio.*[2]

---

2. Mr. Garza's convoluted explanation of the *El Frio's* ownership was recorded during a telephone conversation between him and CPO Cabe:

"I bought [the ship] in a marshal sale. I borrowed the money and gave it to a trustee to hold the title for the trustee. That trustee gave Tony [DePonce] a power of attorney entrusting

him to transfer the title to a corporation for the legal title.

"And that title was is [sic] a corporation that was formed by Tony only as a trustee corporation, which means it's a legal ownership. But it was done for the benefit of Garza Ranch Ship Trust, a trust company. I split the title of the ship so that no one can screw with it.

Although refrigeration is not necessary for shipping marijuana, the *El Frio* had refrigeration units suitable for shipping fresh produce. The purchase price of the *El Frio* was $150,000.

In the spring of 1985, Mr. Garza and Mr. DePonce began preparing the *El Frio* for legitimate commercial shipping voyages, and establishing a front which would enable them to gain the confidence of potential smugglers later. Mr. Wise did not participate in the operations involving the *El Frio*, and Messrs. Garza and DePonce retained the *El Frio's* former captain instead.

By August 9, 1985, the ship was operational, although not fully in class, and it was able to carry a cargo of oranges from the Dominican Republic to Halifax, Nova Scotia, Canada. After depositing its cargo, however, the ship suffered minor damage near Nova Scotia, on August 30, 1985, due to a small fire. In Nova Scotia, Messrs. DePonce and Garza purchased a similar but run-down vessel and stripped it of all its parts for use on the *El Frio*. After a few days of repairs in Dartmouth, Nova Scotia, the ship carried a 1000–ton cargo of potatoes to Puerto Rico. Mr. Garza met the ship in Puerto Rico to supervise unloading and financial settlements, while Mr. DePonce returned to Brownsville, Texas to confer with Officer Cabe. Tr. at 912–15.

Around this time, while the ship was loading up with potatoes, Mr. DePonce became aware of some rivalry between the Customs Service and the DEA. Officer Cabe related an argument he had had with a DEA agent, and told Mr. DePonce not to cooperate with the DEA. Indeed, the plaintiffs noticed many instances where Officers Cabe and Waggoner demanded secrecy surrounding Operation Sealift. Instead of wondering whether the need for secrecy was due to a lack of authorization or even legality, the plaintiffs repeatedly assumed secrecy was needed merely for the success of the operation.

A DEA agent visited Mr. DePonce and warned him that the Customs Service did not have the authority to conduct an undertaking such as Operation Sealift. Instead of heeding this advice, or seeking further information, Mr. DePonce simply replied, "I am sorry, [but] I have to be loyal to the one that hired me. I can't discuss any further about the operation with you." Tr. at 917. According to Mr. DePonce, Officers Cabe and Waggoner grew increasingly fearful that the DEA might appropriate the operation for their own. Mr. DePonce testified that Officer Cabe told him to begin legal shipping to Colombia in order to establish shipping ties to that country and strengthen the front, while Customs would supposedly locate a load of narcotic contraband ready to leave Colombia.

At the trial, Mr. DePonce gave a detailed account of one attempt by Customs to arrange such a shipment of drugs. At a meeting at a Brownsville pancake restaurant attended by Officers Cabe and Waggoner, Mr. DePonce's friend Mr. Juan O'Hara, and a Mr. Rigoberto Davila, it was learned that Mr. Davila had been arrested and convicted on drug-related charges in Miami, Florida, and was about to be sentenced. Tr. at 920. Officer Waggoner agreed to speak with the sentencing judge and the prosecutor in Miami on Mr. Davila's behalf to help in his sentencing in exchange for Mr. Davila's help in setting up a shipment of marijuana to leave Colombia. Mr. DePonce observed Mr. Davila signing receipts for Customs funds forwarded for his living expenses and visited Mr. Davila and his family at the Brownsville Country Club where the Customs Service was lodging them. In the end, Mr. Davila was only able to arrange a shipment of 25,-000 pounds of marijuana, not large enough for using the *El Frio*.

"MR. CABE: Are you an officer in the corporation?
"MR. GARZA: No. I don't have to be an officer in the corporation. The captain of the ship is an officer of that corporation.
"And that corporation is acting as trustee for me, the trustor, since I bought it, he's got title, I can fire all the officers; and I can fire the whole corporation.

 *       *       *       *       *       *

"So anything that that ship does is for the benefit of my trust."
Def.Exh. 28 at 105–06.

In the middle of 1985, the Customs Service was undergoing a major reorganization of its bureaucratic structure. Many officers participated in training and received new posts, duties, or titles. Station Supervisor Alderete, for example, was absent for months of training and then became a Special Agent in Brownsville. By the end of the reorganization, Mr. Juan Flores had become the new station supervisor, known thereafter as the Resident Agent in Charge.

In November 1985, the plaintiffs obtained a contract to ship 18,000 boxes of yams worth $30,000 or $40,000 from Cartagena, Colombia, to Miami, Florida. Mr. DePonce, still in Brownsville, sent the ship empty to pick up the load and then he waited in a rented hotel room next to the Port of Miami for the ship to return. A day or two before the ship was due to arrive in Miami, Mr. DePonce telephoned CPO Cabe's office to find out if any undercover deal had been set up yet, or if there were any further instructions. Tr. at 929. Mr. DePonce talked to Agent Juan Flores, the new supervisor, and found out that CPO Cabe had been sent to the Philippines for several weeks and SCPO Waggoner had been transferred indefinitely to Dallas, Texas.

Mr. DePonce testified that Agent Flores claimed to be fully informed about Operation Sealift. Agent Flores put him in touch with Special Agent Richter of the Customs Service in Miami, who then sent Agent Robert Benavente to meet with him at the hotel cafeteria. According to Mr. DePonce, he informed Agent Benavente that the ship was being used by the Customs Service in Brownsville for a sting operation, that the ship's captain had found a couple of stowaways on board whom were now secured, and that the ship did not contain any drugs. Tr. 933. Mr. DePonce asked Agent Benavente to be careful with the ship and not to publicize its secret mission. Mr. DePonce also inquired about doing a deal with the Customs station in Miami. According to Mr. DePonce, Agent Benavente accused Mr. DePonce of smuggling cocaine or other drugs and mentioned $50,000 as the top price paid to informants, a price far too low for Mr.

DePonce. *Id.* The meeting ended with no agreement and with Mr. DePonce angry.

Agent Robert Benavente, currently the Customs Attache at the American Embassy in Caracas, Venezuela, reported a different and more believable account of the meeting at Mr. DePonce's hotel in Miami. Tr. at 683–89. During 1985, Agent Benavente was supervising Customs' marine smuggling group in Miami and was entrusted with preventing contraband from entering via maritime means. His level within the Customs Service hierarchy corresponded with the level of Supervising Customs Patrol Officers (SCPOs) such as Michael Waggoner and R.C. Williams.

According to Agent Benavente, he was asked by the agent on duty to respond to a call one evening. The next morning, Agent Benavente and two other Customs officers had breakfast with Mr. DePonce in the hotel restaurant. Mr. DePonce proposed to do a sting operation for the Customs Service in Miami, more or less similar to the one outlined in Operation Sealift. Agent Benavente mentioned several ways in which Mr. DePonce's plan was unacceptable. First, he told Mr. DePonce that an informant could never keep the "up-front" money, since it would be criminal evidence and subject to seizure. Second, Mr. DePonce would have to be fully documented and approved by both the DEA and the Customs Service. Third, DEA in Bogota, Colombia, would have to be involved, especially in negotiating with the drug suppliers, for Mr. DePonce would not be allowed to privately arrange a drug deal by himself.

Agent Benavente testified that Mr. DePonce never mentioned anything about Operation Sealift or about working with the Customs Service in Brownsville. In response to the agent's concerns that Mr. DePonce may have been working for or rejected by another agency already, Mr. DePonce simply told Agent Benavente to contact Agent Juan Flores in Brownsville. Agent Flores told Agent Benavente that Mr. DePonce was "not to be taken seriously, * * * he was just a bragger * * *." Tr. at 687.

In late December 1985, the ship came into port in Miami. Mr. DePonce testified that

an "army of guys," perhaps twenty Miami Customs Service agents dressed in black raided the *El Frio,* making "a big show * * * in the middle of the day" and running "in front of everybody" including "the owners of the cargo * * *." Tr. at 933–34. Although no drugs were found, three or four stowaways were recovered.[3] Mr. DePonce yelled at Agent Benavente and asked if he had talked to Agent Flores of the Brownsville station. Agent Benavente replied that Agent Flores had informed him that Mr. DePonce may have been smuggling drugs. The plaintiffs claim that this eye-catching "bust" gave the vessel *El Frio* a bad reputation to such an extent that it was unable to contract any more cargo. This, they maintain, caused the failure of the shipping enterprise and the smuggling operation. Mr. DePonce has admitted, however, that he is not familiar with standard searches in the Port of Miami, and that he really did not have experience in the shipping industry.

Agent Benavente, on the other hand, has conducted hundreds of searches and was in charge of the team that searched the *El Frio.* He testified that the search was standard and common for any vessel arriving from a country, such as Colombia, which is a common source of contraband. The search team, as usual, contained agents of the United States Department of Agriculture, agents of the Immigration and Naturalization Service, and several Customs officers to secure the crew and examine the ship and its contents. The Customs Service found no contraband and cleared the ship for entry. Far from blacklisting a ship, Agent Benavente believes that such standard searches are welcomed by most shippers who can then keep illegal activity off of their vessels. Tr. at 693. The Court finds that Agent Benavente's testimony was more believable than Mr. DePonce's, that the search of the *El Frio* fell within the standard and typical range, and that the search did not besmirch the reputation of the *El Frio* so as to frighten away potential clients.

By March of 1986, due to problems finding further cargo, various debts began to add up. The plaintiffs contacted Officer Cabe to discuss the future of the ship and reimbursement of some $750,000 which they had spent in setting up the operation. The plaintiffs began to wonder whether any undercover operations were ever going to occur, even though the ship could have functioned on behalf of the Customs Service for most of the previous eight months.

On May 7, 1986, the ship was sold for $100,000 for payment of debts. Pl.Exh. 5. Immediately after the sale, Mr. DePonce returned to Brownsville, Texas, and quickly met with Officer Cabe. Tr. at 944. Officer Cabe, recently returned from Asia, explained to Mr. DePonce how the Customs Service had reorganized and how the agency had transferred Officer Waggoner to Dallas and sent Officer Cabe to the Philippines in order to remove from the Brownsville area anyone who had any contact with Operation Sealift. Furthermore, Officer Cabe claimed that all the receipts that Mr. DePonce had turned in to him had been taken, stolen, or misplaced while Officer Cabe was overseas. Officer

---

**3.** Typical of the confusing and hardly believable testimony given at trial by Mr. DePonce was his account of how he captured the stowaways for the Immigration and Naturalization Service:

"[T]he immigration people come along and insist that I have to secure the stow aways myself before they authorize the hatch to be opened and the load coming out. And I said, how the hell I going to get them? He said, well, you have to get them.

"So you know that there's a door over there and then the cargo hull was a big huge hull down. So I start yelling to come out and they don't want to come out. So I took a can of ether, you know, the one you use for the—that smell real bad? And I got in the door and I told the chief engineer, I said, start the fans on the ship, the fan that pulled it.

"And I got in there and started speaking Spanish to the stow aways. And I said, you have five minutes to get out or I'm going to start putting poison, gas poison, through these—and you're all going to die up there.

"So only one guy come out. He surrendered. So I handcuffed him with plastic cuffs immigration gave me. And then I started putting spray in there. And when I started putting the spray they got scared.

"They started coming out. There was two more. And one of them come out with a knife and just taunt me. Just taunt me. He stick the knife in the sides of my jacket you know. And I grabbed his arms, twist it, handcuffed it.

"But the other one just jumped overboard * * *."

Tr. at 935.

Cabe had allegedly been keeping them in a thick file in his desk. At this point, the plaintiffs began to consider suing the Customs Service to recover their expenses.

On April 6, 1987, a meeting took place in the office of the Department of the Treasury's Assistant Secretary for Management, John F.W. Rogers, in Washington, D.C. Present at that meeting, in addition to Assistant Secretary Rogers, were the Inspector General of the Department of the Treasury Michael R. Hill, attorney James S. Taylor, and attorney George W. Abbott. Mr. Abbott was an associate of Senator Paul Laxalt of Nevada and, along with Mr. Taylor, was representing the three plaintiffs in this case. Messrs. Abbott and Taylor had requested the meeting to explain their clients' claim against the Treasury, and try to resolve the matter without litigation. Mr. Taylor provided the Treasury with background information, and Inspector General Hill agreed to initiate an internal investigation.

In May of 1987, Senior Special Agent Joseph Edward Parker from the Customs Service's Office of Internal Affairs in Houston, Texas, interviewed all Customs personnel with any information concerning Operation Sealift. Customs personnel, such as Officers Cabe and Waggoner, repeatedly told Agent Parker that they never promised to reimburse the plaintiffs for their expenses, but that they merely explained the possibility for standard awards given to informants after the successful completion of an operation. Officers Cabe and Waggoner both underwent polygraph testing. Officer Cabe denied promising any payments to the plaintiffs, and he did not display any physiological signs indicative of deception. Tr. at 794; Def.Exh. 32. The examiner did not question him, however, regarding any promises not to confiscate smuggling transport fees. Officer Waggoner's polygraph results were inconclusive due to the fact that, as a part of his work duties, he had been awake operating a boat for the previous twenty-four hours. Agent Parker asked retired SCPO R.C. Williams to give a statement, but he declined because he did not want to cooperate with an investigation which he feared might be tainted.

In May and June of 1987, Agent Parker interviewed the plaintiffs, who reiterated their original allegations. On the advice of their attorneys at that time, the plaintiffs declined to submit to any polygraph testing.

By the end of June 1987, the investigation report was completed and submitted to Customs headquarters in Washington, D.C. Def. Exh. 9. In the report, the internal investigator concluded that Officers Cabe and Waggoner had not promised to reimburse the plaintiffs for their expenses, and that the Customs Service had no stake in the legitimate shipping venture. The report also stated that CPO Cabe informed Mr. DePonce that if Customs employees found any money paid to the plaintiffs as a transport fee by smugglers, it would be confiscated. This conclusion, however, left open the possibility that CPO Cabe might have deliberately avoided any contact with the ill-gotten money, and therefore would have no reason to confiscate it. In summation, the investigator, Agent Parker, opined that the Customs officers and the plaintiffs exchanged some information and ideas and a case file was opened, but no full-fledged undercover operation ever matured. Based on this investigation, the United States Customs Service denied the existence of any contract or monetary obligations owed to the plaintiffs.

On April 15, 1988, Messrs. C. Carlos Garza, Jr., Anthony DePonce, and Johnie Wise jointly filed a Complaint initiating the current action for breach of contract in the United States Claims Court, now renamed the United States Court of Federal Claims. Although originally seeking some $16.5 million in damages, the plaintiffs later amended their Complaint to seek expectation damages in the amount of $6 million based upon the expected up-front money of two successful undercover marijuana shipments. In the alternative, the plaintiffs wish to be made whole by receiving $1,021,688 to pay for actual expenses they allegedly incurred in furtherance of Operation Sealift and not reimbursed by the Government.

On February 13, 1989, the defendant filed a Motion to Dismiss, contending that this Court cannot recognize oral contracts, that no one with authority in the Government

entered into any contract, and that certain claims involving torts were beyond this Court's jurisdiction. On January 30, 1991, after numerous substitutions of counsel, this Court granted the defendant's Motion to Dismiss with regard to the tort of infliction of emotional distress and denied the remainder of the Motion. On July 7, 1990, Customs Patrol Officer William Cabe died of lung cancer. Before his death, CPO Cabe provided the parties with a deposition. Def.Exh. 30.

On October 5, 1991, the defendant filed a Motion for Summary Judgment, which was denied on May 20, 1994. The Court held at that time that many facts remained in dispute and a thorough airing of the factual circumstances of the case was necessary.

Trial was held in Washington, D.C., at the National Courts Building from November 15 through November 18, 1994. The Court also convened for one day on November 22, 1994, to take testimony at the United States Federal Correctional Institute in Texarkana, Texas, where Mr. Anthony DePonce is currently incarcerated following convictions on several counts of major drug distribution. Closing arguments took place in Washington, D.C., on December 1, 1994.

### Discussion

The facts of this case, although complicated, are not unique. This Court has encountered other cases where informants and participants in sting operations raised similar claims for reimbursement, for rewards, and for damages from lack of expected payments from allegedly criminal third parties. As will be seen, an overriding public policy concern, which permeates this Court's treatment of these cases, is the respect and deference accorded to prosecutorial discretion.

### I. The Agreement to Allow Plaintiffs to Retain the Up–Front Transport Fee

■ As an initial matter, the Court finds that the plaintiffs, Messrs. Garza, DePonce, and Wise, did reach an agreement with CPO Cabe and SCPO Waggoner wherein the Customs Service would allow the plaintiffs to retain the transport fee (the "up-front" money) paid by the alleged drug smugglers abroad. This Court is convinced that Officers Cabe and Waggoner encouraged the plaintiffs to proceed with the purchase of a vessel and the establishment of a legitimate commercial shipping venture by promising the plaintiffs that, if they helped in a sting operation and if they received money from the criminal wrongdoers, the Customs Service would refrain from confiscating this ill-obtained money. Mr. Wise summed up the entirety of the agreement during a recorded telephone conversation with Agent Parker, the internal investigator:

> [I]t's a shame because this thing could have been a beautiful thing for Customs, and we could have made some money. * * * We did it as a profit incentive, and the Customs, it would not have cost them * * * one nickel, because all of the money that was going to be paid to us was what we would have gotten up front from the bad guys.

Def.Exh. 28 at 53. Officer Cabe admitted to basically the same agreement in his deposition. Def.Exh. 30 at 48–49; *see also* Def. Exh. 28 at 117. In addition, the Court believes the testimony of SCPO R.C. Williams that such arrangements had been made before for other sting operations and that private citizens in the past had successfully kept the up-front money. Finally, the subsequent actions of the plaintiffs in borrowing and expending great amounts of money in order to locate, purchase, and refurbish a ship, and their continuous efforts to remain in fairly close contact with CPO Cabe, convinces this Court that the plaintiffs and Officers Cabe and Waggoner had reached an agreement that the plaintiffs would participate in Operation Sealift in exchange for permission to retain the transport fee.

The agreement was simply that if and when the drug smugglers paid the plaintiffs any money, Customs would refrain from confiscating it. Because the transport fee was to be paid by the perpetrators in Latin America who wished to ship their illegal goods to the United States, and not by the Government, the Government could not have promised that the plaintiffs would definitely

receive a minimum fee.[4] The Government had no control over whether some third party would make a payment. The plaintiffs could have alleged that Customs employees guaranteed that they would receive a certain sum from the criminals, but that is not exactly alleged, nor would it be enforceable. The Customs Service might have promised to recommend the return of the fee after its seizure, or to inform the Internal Revenue Service that the money was income obtained legally as part of a sting operation. Yet, in the end, this Court finds that the primary consideration that the Government promised the plaintiffs was the forbearance from seizing any transport fee as evidence.

■■■ Even though the Customs Patrol Officers freely agreed to look the other way and refrain from confiscating the up-front transport fee from the plaintiffs, this Court holds that such an agreement does not constitute a valid or binding obligation upon the Government. Prosecutorial discretion dictates that a law enforcement agency cannot be bound to conduct, or not to conduct, its investigation in a certain manner. "The law enforcement functions of the executive branch have their roots in Article II's command to 'take Care that the Laws be faithfully executed.' U.S. Const. art. II, § 3." *Howard v. United States,* 31 Fed.Cl. 297, 306 (1994). The decision to prosecute or not lies squarely within a prosecutor's discretion and he or she possesses absolute immunity over that decision. *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985); *Lewis v. United States,* 32 Fed. Cl. 301 (1994); *Wellman v. West Virginia,* 637 F.Supp. 135, 138 (S.D.W.Va.1986). No private citizen has the right to compel any public official to investigate or prosecute a particular crime. *Fulson v. City of Columbus,* 801 F.Supp. 1, 6 (S.D.Ohio 1992); *Doe v. Mayor & City Council of Pocomoke City,* 745 F.Supp. 1137, 1139 (D.Md.1990).

The facts and allegations of *Howard* are remarkably similar to those in the case at hand. In *Howard,* the two plaintiffs occasionally helped in Customs Service sting operations by posing as international arms dealers willing to sell weapons to illegal recipients, such as South Africa and Iran. The plaintiffs assisted the Customs Service in exchange for permission to retain a five to ten percent commission or broker's fee on the arms transaction. Reimbursement of some expenses also occurred, especially since the plaintiffs spent many days and weeks planning and traveling on behalf of the sting operations. Customs agents also informed the plaintiffs of the possibility of moiety awards of 25 percent of the value of any items seized.

In *Howard*'s first sting operation, dubbed Houston I, the plaintiffs in that case retained $600,000 in commission, minus $150,000 in unreimbursed expenses. Additionally, the Customs Service seized over $8.4 million in property, and awarded the plaintiffs a moiety of $250,000. *Howard,* 31 Fed.Cl. at 301. *Howard*'s next sting operation, named Houston III, was not nearly as precisely planned or successfully executed. Eventually, it devolved into a lawsuit. Over a span of sixteen months, the plaintiffs had developed a plan with Customs agents to arrest a certain British arms smuggler. The Court in *Howard* noted that the plaintiffs slowly began to take on the direction and implementation of the operation instead of the Customs agents. The latter did not particularly mind as long as they apprehended and convicted the criminal exporter in the end. *Id.* at 302. The plan, according to the plaintiffs, grew into the following:

(1) Plaintiffs would retain a commission on any arms sale as agreed in Houston I; (2) Unless confronted with the inability to make a prosecutable case against [the smuggler], Customs would pursue the case to its logical conclusion; but if [the smuggler] backed out, plaintiffs would cover their own expenses; (3) If the government were to file only conspiracy charges or drop the investigation before the case

---

4. Such a situation would not be a typical third-party-beneficiary contract where A (the Government) promises to B that A will do something beneficial to C (the plaintiffs), and C now seeks to enforce. Instead, the situation would be that A (the Government) promised to B (the plaintiffs) that C (the smugglers) would pay money to B, even though A has no control over C. Such a situation would obviously lack adequate consideration for a contract.

reached its logical conclusion, then the government would reimburse plaintiffs for any expenses incurred in furtherance of the operation; and (4) the government would guarantee plaintiffs a final net profit of at least $1 million dollars.

*Id.* at 302 (footnote omitted). The plaintiffs in *Howard*—like the plaintiffs in the case at bar—expended large sums of money in furtherance of Operation Houston III, and they maintained close contact with the Customs agents involved. Eventually, however, employees of the Customs Service headquarters in Washington, D.C., were sent to take over the operation. Several months later, at a joint meeting in Washington, D.C., a group of senior Justice and Treasury Department officials agreed that the sting's target was not worth pursuing, and that decision effectively terminated the operation. *Id.* at 306. The plaintiffs there, as in the current case, sued for their expected commission and for reimbursement of their expenses. They alleged that the Customs Service breached its contract by not adequately carrying the sting operation through to its "logical conclusion"; namely, one in which the plaintiffs would obtain a commission. *Id.* The Court denied all of the plaintiffs' claims, holding the terms unenforceable due to the presence of prosecutorial discretion.

> The prosecutorial function is concomitant with the investigative function. The purpose of a criminal investigation is to obtain sufficient evidence against the perpetrator of a criminal act to permit that perpetrator's successful prosecution; when the prosecutor determines not to prosecute the target of the investigation, that investigation loses its purpose. No legitimate reason then exists to continue the investigation. Any agreement that binds the government to continue a criminal investigation thus shorn of its public purpose must fail as contrary to public policy. * * * No agreement could force the government to continue the investigation or subject the government to liability for halting it.

*Howard*, 31 Fed.Cl. at 306–07 (citations omitted).

With regard to retaining the commission, the Court in *Howard* found that the plaintiffs and the Customs agents had indeed formed an agreement. Even so, the Court held that:

> a promise of a federal law enforcement agency to refrain from the exercise of its lawful duties in obtaining evidence for the prosecution of a suspected criminal as a matter of public policy cannot bind the agency. If such a promise were to bind Customs here, it would functionally delegate the control of a criminal investigation to the private obligors * * *. If, as plaintiffs' counsel asserted at trial, plaintiffs had an 'arrangement with the government to let them earn the commission,' a situation would have developed in which Customs, a federal law enforcement agency, essentially had bound itself not to interfere with *plaintiffs'* expectations from the sting. A contract that places a government agency in such a situation violates public policy by removing investigative, and thus prosecutorial, discretion from the hands of the government and placing it in those of private citizens.

*Howard*, 31 Fed.Cl. at 308. As this passage implies, it should be the *Government's* expectations of a sting operation and the *Government's* needs and goals that are dominant in this type of activity. Otherwise, this executive function would be abdicated to private citizens who are not sworn to protect and to serve the public and whose interests are primarily pecuniary.[5] Furthermore, as stated earlier, a private citizen has no right to force an agency to investigate or prosecute any particular crime.

As in *Howard*, therefore, this Court will not allow a plaintiff to retain illegal monies which would normally, in the public's best interest, be seized as evidence. *Howard* shows that, had Messrs. Garza, DePonce, and Wise received an up-front transport fee from narcotic smugglers in South America, and had the Customs Service seized this money as evidence, the plaintiffs could not have brought a lawsuit claiming that sum as their own rightful property. Even more so, then, the plaintiffs cannot now claim that the Gov-

---

5. Mr. DePonce testified, for example, that Mr. Wise approached him with the request to partici-

pate in Operation Sealift so that they could make a lot of money. Tr. at 897.

ernment should pay them the $3 million or $6 million which the plaintiffs expected to receive from the Colombian smugglers. For this Court to award such expectation damages would be perverse indeed.

■ Moreover, the Customs Service never breached any agreement with Messrs. Garza, DePonce, and Wise with regard to the transport fee. Even though the three plaintiffs had an oral agreement with Officers Cabe and Waggoner, and even assuming for argument's sake that such an agreement did not violate public policy, the plaintiffs would still not be entitled to any award from the Government because no present duty to perform its part of the agreement ever arose. Only if plaintiffs had loaded a shipment of drugs and had received a payment from the South American smugglers, would the Government's duty of noninterference have arisen. No such shipment, however, ever transpired, nor was any transport fee ever tendered. The plaintiffs cannot blame Customs for not setting up a situation which would have allowed the plaintiffs to reap an illegal transport fee. "In other words, plaintiffs' attempt to shift to the government the risk of the nonoccurrence of the transaction fails" because the Customs Service retains the "undelegable discretion" to initiate criminal investigations, to pursue them with fervor or with apathy, and to terminate them as appropriate. *Id.* at 308–09.

## II. The Alleged Agreement to Reimburse Expenses

The plaintiffs incurred many expenses in conjunction with the events described herein. The plaintiffs invested large amounts of their own money and borrowed even more. In their Complaint, and elsewhere, they claim reimbursement from the Government for all of these expenses. For example, the plaintiffs seek repayment for travel, hotel, and telephone costs incurred while searching for and finding a vessel and while traveling in search of financing. Second, the Complaint prays for compensation for the purchase price of the vessel and for the cost of its refurbishment. Third, the plaintiffs ask for reimbursement for the overhead costs of running a legitimate commercial shipping firm

as a front or facade, such as fuel, crew wages, broker's fees, travel, and telephone expenses. Finally, the plaintiffs request reimbursement for the overhead costs of running the ship as a part of a sting operation, even though the *El Frio* never actually conducted any covert smuggling voyages.

■ The Court of Federal Claims only has jurisdiction over actual contracts, whether express or implied in fact, but not over contracts implied in law. *Alabama v. United States*, 282 U.S. 502, 507, 51 S.Ct. 225, 226–27, 75 L.Ed. 492 (1931); *Hatzlachh Supply Co. v. United States*, 7 Cl.Ct. 743, 748 (1985). To establish the existence of a contract, whether express or implied-in-fact, plaintiffs must show:

(1) that there was an unambiguous offer to contract, upon *specific* terms;

(2) that there was an unambiguous acceptance of that offer;

(3) that both parties intended to enter into a contract, often called mutuality of intent; and

(4) that the United States received consideration.

*See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Fincke v. United States*, 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608–09, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Kentucky v. United States*, 27 Fed.Cl. 173, 176 (1992); *Delco Elec. Corp. v. United States*, 12 Cl.Ct. 367 (1987), *aff'd*, 909 F.2d 1495 (Fed.Cir.1990); *Shaw v. United States*, 8 Cl.Ct. 796, 799 (1985). Also, when the United States is a party, an additional requirement is added: the Government official, whose words or conduct are relied upon, must have actual authority to bind the Government in contract. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *City of El Centro*, 922 F.2d at 820; *Juda v. United States*, 6 Cl.Ct. 441, 452 (1984). Stated another way, the United States Government may generally deny unauthorized acts of its agents. *Fed. Crop Ins. Corp. v. Merrill*, 332

U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Allen v. United States,* 229 Ct.Cl. 515 (1981); *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 9, 479 F.2d 1334, 1338 (1973); *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 711–12, 468 F.2d 922, 925 (1972); *Howard,* 31 Fed.Cl. at 312; *Buffalo Nat'l Bank v. United States,* 26 Cl.Ct. 1436, 1445 (1992).

While all of the parties agree that no one signed an express, written contract, and certainly no official bidding procedure occurred, the plaintiffs still claim that an implied-in-fact contract to reimburse them was created by the facts and circumstances surrounding the operation. To establish the existence of an implied-in-fact contract, plaintiffs must demonstrate the same elements required for an express contract as mentioned above, *i.e.,* lack of ambiguity in offer and acceptance, consideration, and mutuality of intent. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *Howard,* 31 Fed.Cl. at 312. "[Plaintiffs] would have to prove the same elements required for an express contract, including a meeting of the minds as to specific contract terms." *Detroit Int'l Bridge Co. v. United States,* 32 Fed.Cl. 225, 230 (1994). The plaintiffs have not met this burden.

This Court finds that there was no "meeting of the minds" in that the parties did not agree on any terms specific enough to form a binding contract. On the contrary, the plaintiffs themselves testified that expenses and other specifics were almost never discussed. Tr. at 887, 892.

First of all, the plaintiffs never had any understanding that the Customs Service would reimburse them for the purchase price of the vessel. Tr. at 47, 67, 71 (Wise), 189–192, 420–21 (Garza), 1041 (DePonce). Second, Mr. Garza testified that it was his belief that Customs somehow agreed to pay all refurbishment costs, even before Customs knew what ship would be bought or whether or not it would need any repairs at all, thus placing no limits on what the Government would be expected to pay to bring the ship into working condition. Tr. at 448–49. Mr. DePonce testified, however, that the parties did not anticipate reimbursement of refur-

bishment costs. Tr. at 1057. This Court does not believe that a Customs Service officer or agent would agree to pay to refurbish a vessel when he or she did not even know what size or type of vessel the plaintiffs would buy or how much overhauling it might need, if any at all. Moreover, the evidence in this case indicates that they did not so agree. This Court therefore finds that no agreement was reached regarding refurbishment costs.

Second, this Court does not believe that Officers Cabe and Waggoner agreed to set no limits on how much the plaintiffs could spend to travel the globe in search of a vessel and its financing. Tr. at 418 (Garza). The plaintiffs apparently decided what expenses were necessary and which were not without even seeking prior approval from Customs before incurring any particular expense. Tr. at 413–18. The plaintiffs claim that they merely had to hand receipts over to Officer Cabe and that he would pay for everything, or at least help them out. Tr. at 417. Under the rubric of searching for a vessel, the plaintiffs included car rentals, airline tickets, telephone calls, hotels, and meals consumed not only while traveling in Europe and the Caribbean in search of a vessel itself, but also while traveling within the United States in search of financing. The Court does not believe that the parties came to any agreement regarding reimbursing any specific expenses incurred while searching for a vessel, or regarding any limits. Therefore, the Court finds that no enforceable contract existed as to the reimbursement of these expenses.

Moreover, this finding is supported by the fact that the plaintiffs took well over a year to find a ship and to register it. So much time had passed that the station supervisor, Mr. Alderete, assumed that the Operation Sealift file had been closed. If the Customs Service had information in April of 1984 regarding a drug smuggler who wanted to ship up to fifty or one hundred tons of marijuana from Colombia to Texas, it is illogical to believe that Customs or the smuggler would wait for one year while the plaintiffs traveled around the world slowly looking for a ship. Even if the Customs Service did have a supplier lined up in 1984, plaintiffs could not

expect Customs to be ready to ship when they—the plaintiffs—had finally organized themselves fifteen months later.

As for any agreement that Customs would reimburse the plaintiffs for costs associated with the commercial shipping venture, this Court similarly finds that no such agreement existed there either. First, Mr. Garza and Mr. DePonce themselves admitted as much during trial.[6] Mr. Wise testified that Officers Cabe and Waggoner informed him that Customs would "help" with the expenses for fuel and crew wages, Tr. at 47, yet Mr. Wise could not recall the two officers ever setting any limit on these expenses, on the number of crew, or on the potential duration of Operation Sealift. Tr. at 45, 55, 66–67 (Wise), 1047 (DePonce). The logical and most likely conclusion, therefore, is that the officers were speaking generally and did not intend to create a firm, binding agreement unless and until more information was obtained and certain events came to pass.

The Court finds it significant in this regard that the plaintiffs did not seem inclined to share with Customs any profits or losses arising from the shipping venture. Mr. Garza planned to deduct the losses and the business expenses from his own personal income tax statement. Tr. at 391. Moreover, a separate corporate checking account was opened ostensibly to keep Operation Sealift and *El Frio* business funds separate from other money, yet Mr. Garza used money from this account to pay his other bills, and sometimes he would use his own checking account to pay *El Frio's* bills. Similarly, despite installing a new, separate telephone line supposedly dedicated to business involving the *El Frio*, Mr. Garza often used his telephone lines without distinguishing between their intended uses. Such behavior leads this Court to conclude that the plaintiffs conceived of and treated the shipping venture as their own endeavor, not as a part of Operation Sealift or as coming under the ownership, responsibility, or guidance of the Customs Service. This Court finds, there-

fore, that no contract existed regarding the reimbursement for fuel, wages, or other costs from the legitimate commercial shipping venture.

As for any agreement to pay the ship's expenses during any actual sting activities, the significance of such an agreement would be purely hypothetical, for no shipments of contraband actually occurred. Accordingly, the Court shall not address that issue.

While the plaintiffs' evidence did little to prove the existence of any contract for the reimbursement of their expenses, the defendant presented substantial and strong evidence to counter the plaintiffs' allegations.

The man who should have been a major witness in this case, Customs Patrol Officer William Cabe, unfortunately had died of cancer before the trial took place. His words were presented to the Court, however, in the form of transcripts from a deposition and from secretly recorded telephone conversations. In his deposition, CPO Cabe described a proposed operational plan of Operation Sealift. Def.Exh. 30 at 58–62. The document contained suggestions for off-loading sites, placement of Customs and DEA agents, and an estimate of $6,000 for Customs employee overtime and travel expenses, but it did not mention the names of the plaintiffs because he considered them confidential informants. *Id.* The document made no mention of reimbursing the plaintiffs. This written outline was only a proposal which never progressed into an active operation.

Transcripts of several telephone conversations secretly recorded by the plaintiffs were also presented to the Court at trial. Pl.Exh. 65–68; Def.Exh. 23, 24, 27, 28. They included two between CPO Cabe and Mr. DePonce, and one between CPO Cabe and Mr. Garza. The plaintiffs have attempted to construe these conversations as admissions on CPO Cabe's part that he promised to reimburse them for their expenses. Nowhere does

---

6. Mr. Garza testified, "[t]here was a discussion of, of—you know, I had no idea of what they planned to pay, and, and that's the only thing I remember in our discussion." Tr. at 418–19; *see also* Tr. at 492.

Similarly, Mr. DePonce testified, "we were going to get some help as for expenses, but I can't detail what type of expenses. We never discussed in detail what it was." Tr. at 887; *see also* Tr. at 1069.

CPO Cabe do this. Officer Cabe never said he or Customs would pay any bills. He never gave advice or took responsibility for the financial difficulties of the *El Frio*. He never told Mr. DePonce or Mr. Garza how to handle their legal affairs. In fact, CPO Cabe was downright ambivalent and unconcerned, not an attitude associated with someone who has an interest in the outcome of the vessel's problems. The most CPO Cabe said was that his superiors authorized him to pursue any leads the plaintiffs may have given him, and to do preliminary work toward setting up a sting operation. As CPO Cabe put it, "I got authorization to do a deal." Pl.Exh. 68 at 41.

The Court finds that the plaintiffs failed to elicit any significant admissions from Officer Cabe. Tr. at 1099–1100. Even though the plaintiffs were in the midst of great financial difficulties and their ship was on the auction block, neither Mr. DePonce nor Mr. Garza said to Officer Cabe, "Do you recall that we have an agreement that you are going to pay our expenses? Where is the money?" That would have been the most natural and logical question if the parties had had a contract. The fact that Messrs. Garza and DePonce failed to pose such questions tends to show that no agreement for reimbursement ever existed.

Supervising Customs Patrol Officer Michael Waggoner described Operation Sealift as a general proposal, one with some good ideas which might have progressed later into an actual sting operation, but one which never got off the ground. Tr. at 577. SCPO Waggoner testified that there was no agreement to reimburse the plaintiffs for the cost of looking for a ship, nor for the purchase price of a ship, nor for the cost of starting and maintaining the legitimate commercial venture as a front. Tr. at 589–90. He mentioned that Operation Sealift never involved a contract and was never even a very active case. Instead, the plaintiffs would have had to supply more specific information, the Customs Service would have had to notify the Drug Enforcement Agency, and someone with authority would have had to approve of the operation. *Id.*

Mr. Guadalupe Alderete, the station supervisor in Brownsville, Texas, read the memoranda from SCPO Waggoner and Officer Cabe and remembers discussing the general proposal with them a few times. Tr. at 634–36. Yet, Station Supervisor Alderete was never aware of any potential buyers or sellers and he believed that, as informants, the plaintiffs were going to provide that information. He never gave permission for any reimbursement of anything, and, in fact, was under the impression that the file on Operation Sealift was closed a few months after it was opened due to lack of progress. *Id.*

Supervisor Alderete passed the memoranda along to his superior officer Mr. Arthur Cser, who was the District Director of Patrol in Laredo, Texas, until late 1984, and then as a part of the reorganization effort became the Senior Special Agent in San Antonio. Although, by the time of trial, Agent Cser no longer had any independent recollection of this particular proposal, under oath he stated that he probably read the memoranda as they passed across his desk. Tr. at 660. He testified that, in the mid–1980's, the Customs Service was encouraging its officers to suggest proposals and to be creative in order to interdict contraband more successfully. He read many proposals at that time but would not react unless a proposal was ready to mature into an active operation. As for reimbursing informants, Agent Cser stated, "I'm not aware of any, any informant being paid his expenses in any case that I'd ever been involved in." Tr. at 663.

This Court finds that many proposals were created within the Customs Service during this period, but that Operation Sealift definitely never went beyond the proposal stage. There were meetings, there were discussions, and ideas were bandied about, but there was never any meeting of the minds over terms specific enough to form a contract. The plaintiffs therefore fail in establishing a necessary element for the creation of a contract.

### III. Lack of Authority to Bind the Government

Even if the plaintiffs and Officers Cabe and Waggoner had reached an agreement over specific terms, the plaintiffs would have had to establish an additional element

needed for a valid Government contract, that of authority. Again, the plaintiffs did not present any real evidence, as they must, that any official, with whom they dealt, possessed the necessary actual authority to bind the Government in contract. *See H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Hoch v. United States,* 31 Fed.Cl. 111 (1994); *Gratkowski v. United States,* 6 Cl.Ct 458 (1984). "One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with actual authority to enter the contract alleged." *Haight v. United States,* 209 Ct.Cl. 698, 538 F.2d 346, *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). While the plaintiffs may show either express or implied authority, *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 87, 98 F.Supp. 757, 766, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951), the plaintiffs bear the burden of proving the authority's existence. *EWG Assocs., Ltd. v. United States,* 231 Ct.Cl. 1028 (1982); *Kania v. United States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Miller Elevator Co. v. United States,* 30 Fed.Cl. 662, 693–94 (1994), *appeal vol. dismissed,* 36 F.3d 1111 (Fed.Cir.1994); *Llamera v. United States,* 15 Cl.Ct. 593, 597 (1988).

## A. Express Authority

█ An employee of the Government possesses express authority to obligate the Government only when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms. *Howard,* 31 Fed.Cl. at 312. Messrs. Garza, Wise, and DePonce presented no evidence other than unsubstantiated allegations that Officers William Cabe, Michael Waggoner, R.C. Williams, or even Station Supervisor Guada-

lupe Alderete or Senior Special Agent Arthur Cser had any express authority to obligate the Customs Service to reimburse any of the plaintiffs' expenses.[7] In other words, the plaintiffs did not offer any statutes or regulations which would grant such authority to the Customs officers. Such a lack of proof would enable this Court to find that no authority existed. *Kania,* 227 Ct.Cl. at 465, 650 F.2d at 268; *Howard,* 31 Fed.Cl. at 313 n. 12.

The defendant, however, has made this Court's task even easier by supplying the regulations that govern Customs agents authority in this area. Helpful to the Court was the testimony of Mr. John Rennish, a long-time Customs employee who worked in the Special Investigations Division from 1982 to 1986 and who revised Chapter 41 of the Customs Service's Special Agent Handbook (the Handbook). Tr. at 822–24. Chapter 41 contains lengthy directions explaining the types of payments which informants may receive and precise procedures for effecting such payments. Def.Ex. 22.

Mr. Rennish's amendments to Chapter 41 of the Handbook went into effect on April 10, 1984, and covered the time period relevant to the current case. The 1984 Handbook listed three methods of paying informants: (1) award of compensation (moiety); (2) emergency confidential payments; and (3) purchase of information or purchase of evidence. Def.Ex. 22; *See also Howard,* 31 Fed.Cl. at 313 (discussing the Handbook's procedures for paying sources of information). The first two types of payments occur in circumstances different from those present here. Moieties or awards of compensation are given to persons whose information aided in the recovery of penalties, forfeitures, or seizures, most often under the scheme of 19 U.S.C. § 1619 (1982). That statute provided that persons who divulged such information could claim an award of 25 percent of the value of

---

7. The testimony of SCPO R.C. Williams contained several conclusory statements which basically suggested that, because these kinds of agreements had existed before in other sting operations, these agreements must have been approved high up by senior Customs officials. Mr. Williams, however, could give no specifics re-

garding the express authority of various Customs employees, nor regarding any specific terms of the plaintiffs' agreement. In fact, Operation Sealift was assigned to SCPO Waggoner, not to Mr. Williams, who therefore had little first hand knowledge.

the recovery up to $50,000.[8] Several other statutes outline similar compensation programs.[9] Because no seizures or penalties occurred in Operation Sealift, moieties are not an issue before the Court. Similarly, the emergency confidential fund does not have any relevance to the compensation sought by the plaintiffs in this case. The Customs Service uses this fund when conventional payments to confidential sources would threaten the safety of either the source or Customs officers. Only senior Customs officials may authorize such confidential payments.

Purchases of information (POI) or purchases of evidence (POE) differ from moiety awards in several ways. POIs may be made in order to enforce any law which the Customs Service enforces, not just violations of customs laws. The Customs Service need not obtain any recovery before paying a POI or a POE. Furthermore, minor payments may be made for food, drink, or per diem when an informant is in the company of a Customs officer in the course of an undercover operation.[10] Payments would issue only upon proper documentation of the recipient and of the evidence or information obtained. The actual payment would have to be witnessed by two Customs officers.

Various high level Customs officials could approve POI or POE payments. The lowest of these officials domestically were the Assistant Regional Commissioners for Enforcement (ARC(E)) and the Regional Directors of Internal Affairs, both of whom had authority to obligate Customs up to $10,000. Assistant Commissioners could approve amounts up to $20,000, and approval of the Commissioner of the entire Customs Service was necessary for payments over $20,000. An ARC(E) could delegate his or her authority to Special Agents or Station Supervisors in the field, as deemed necessary, but only in writing and with copies filed with the Customs Service Headquarters.

Mr. Donald Turnbaugh, formerly the Assistant Regional Commissioner for Enforcement (ARC(E)) at the Customs Regional Office in Houston, Texas, was the individual who oversaw all enforcement activities in four southwestern states. In his useful testimony regarding payments to informants, ARC(E) Turnbaugh repeatedly referred to Chapter 41 of the Handbook. Tr. at 714–16. ARC(E) Turnbaugh testified that, although he could have delegated his authority to obligate Government funds up to $10,000 to several individuals below him, he never did so. Tr. at 717–20. Neither Officers Cabe nor Waggoner, therefore, nor Station Supervisor Alderete had any authority to approve reimbursement of the plaintiffs' expenses. No one who interacted with the plaintiffs had a contracting officer's warrant to obligate funds. Joint Exh. 1; Tr. at 817. No one who interacted with the plaintiffs had any authority to promise to pay their expenses, and no provision was made in the regulations to reimburse anyone for many of the kinds of expenses claimed in this case.

Indeed, Mr. Curtis W. Hamilton, Director since 1989, of the Budget Division within the Customs Service's Office of Finance, testified regarding a review he conducted of the Customs Service budget for fiscal year 1984. Tr. at 801–11. Payments for POIs, POEs, and for setting up undercover or sting operations falls in the budget under "special personal service payments." Mr. Hamilton noted that in 1983, the President's budget, as submitted to Congress for approval, originally estimat-

---

8. In the past, such awards were considered mandatory. *Lacy v. United States*, 221 Ct.Cl. 526, 607 F.2d 951 (1979); *Tyson v. United States*, 91 Ct.Cl. 139, 32 F.Supp. 135 (1940); *Rickard v. United States*, 11 Cl.Ct. 874 (1987). The current statute, 16 U.S.C. § 1619 (1988), has been amended to allow at least some discretion in the awarding of compensation. A split has now arisen between those who believe that, while the amount of an award is now discretionary, the statute still mandates that some award be granted and those who believe that the award itself is discretionary. *Compare Lewis v. United States*, 32 Fed.Cl. 59 (1994); *with Doe v. United States*, 32 Fed.Cl. 472 (1994). Because no seizures or arrests were made in the case at hand, this Court takes no position on the current status of moieties.

9. *See, e.g.*, 18 U.S.C. § 1963(g)(3) (1988); 18 U.S.C. § 3059 (1988); 21 U.S.C. § 886 (1988); 22 U.S.C. § 401 (1988).

10. Such expenditures are small and rare, and never exceed standard per diem limits which currently are set at $35 per day, or reasonable out-of-pocket expenses.

ed and requested $2,399,000 for special personal service payments. Def.Exh. 11, line 11.8. Within Congress' actual appropriation of $600 million for the Customs Service for fiscal year 1984, Congress approved $3,551,000 for special personal service payments. Def.Exh. 12, line 11.8. In the end, Customs paid out $1,981,000 for these services, with the rest of the money most likely shifting to other uses after permissible adjusting of Congress' appropriation. Def.Exh. 13, line 11.8; Tr. at 807.

The Court finds this budgetary evidence enlightening, for while the plaintiffs currently ask this Court to order judgment against the Customs Service to reimburse $1,021,688 worth of plaintiff's expenses, the evidence shows that the entire national appropriation for such expenses was $3.551 million. The plaintiffs allege, in other words, that a patrol officer and his supervisor could obligate 29 percent of the Customs Service's allotment set aside for that item nationwide. The Court finds such a notion difficult to accept.

The plaintiffs have argued that they had no way for them to know that Officers Cabe and Waggoner did not possess the requisite authority to approve such expenditures. The plaintiffs have successfully established that portions of the Handbook including Chapter 41 are secret, and indeed the Government insisted on a Protective Order to cover those portions presented at trial. While some sections might be obtainable through a Freedom of Information Act (FOIA) request, other sections are not subject to release to the public at all. Tr. at 729–31. A potential informant or contractor would probably be frustrated in his or her attempt to discover the delegation of authority granted to various Customs officials, but those are not the facts in this case. Messrs. Garza, DePonce, and Wise never tried to locate written documentation outlining the authority of the officials with whom they were dealing. Even more importantly for the case at hand, the burden to prove the existence of contracting authority rests squarely on a plaintiff, generally accomplished by pointing to some unambiguous statute, regulation, or rule. The standard presumption to be followed, both by contractors and by the Court, is that a Gov-

ernment official has no contracting authority unless otherwise expressly bestowed. Here, the plaintiffs did not prove, even minimally, that Officers Cabe or Waggoner had any express authority. Meanwhile, the defendant has demonstrated in precise and definite terms who had authority and who did not. The plaintiffs therefore clearly fail in establishing that anyone, with whom they dealt, possessed express authority to contract with them for the amounts at issue.

B. Implied Authority

On a few occasions, a Government official may bind the Government if that official has actual implied authority. " 'Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.' " *H. Landau & Co. v. United States*, 886 F.2d at 324 (quoting JOHN CIBINIC & RALPH NASH, FORMATION OF GOVERNMENT CONTRACTS 43 (1982)). Before any implied authority can exist, however, some express authority must first exist upon which the implied authority can be based. *City of El Centro v. United States*, 922 F.2d 816 (Fed.Cir.1990); *Grismac Corp. v. United States*, 214 Ct.Cl. 39, 44–45, 556 F.2d 494 (1977); *Miller Elevator Co.*, 30 Fed.Cl. at 694. In *Allen v. United States*, 229 Ct.Cl. 515 (1981), for example, the plaintiff informant claimed he had a contract with the DEA to supply them with information in exchange for $50,000 plus expenses. The Court noted that the two DEA agents with whom the plaintiff dealt had no actual express authority to bind the Government, *Id.* at 516, so that the plaintiff could not have assumed that the agents had any extra or understood authority to create a contract.

Officers Cabe, Waggoner, and Williams likewise possessed no authority to make any promises to reimburse on behalf of the Customs Service. The duties of a CPO, such as CPO William Cabe, did not include obligating funds. Instead, a CPO patrolled his or her assigned area, documented information, investigated leads, and sent recommendations to his or her superior. An SCPO's duties were similar except that he or she spent more time indoors completing ad-

ministrative tasks. The Court finds that these duties cannot be reasonably implied to include authority to obligate thousands of dollars of Government funds. Officers Cabe, Waggoner, and Williams did not possess implied authority.

### C. Ratification

 The plaintiffs also suggest that even if the lower level agents with whom they dealt lacked authority, higher and more senior Customs officials ratified the agreement to reimburse expenses. Yet, the highest official who had any kind of knowledge of Operation Sealift seems to have been Senior Special Agent Arthur Cser, and he only knew of its general existence, not its terms or specifics. In order for a superior official to ratify a contract, that official must have full knowledge of all the details of the matter upon which the unauthorized action was taken. *United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 375, 45 L.Ed. 563 (1901); *California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27–28 (1990), *aff'd,* 937 F.2d 624 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992). Certainly here, Mr. Cser did not have full knowledge of the facts, nor did he even have authority to obligate Government funds. He could not, therefore, have ratified any agreement to pay expenses.

Thus, in summary, the Court finds against the plaintiffs for several reasons. First, although the Court finds that the plaintiffs did reach an agreement with Officers Cabe and Waggoner wherein the Customs Service would allow the plaintiffs to retain the transport fee (the "up-front" money) which would have been paid by the alleged drug smugglers abroad, the Court nevertheless holds, for public policy reasons, that such an agreement is not one that could bind the Government. Second, the Court finds that no agreement was reached regarding reimbursement or compensation for expenses. There was simply no meeting of the minds, or sufficiently specific and detailed terms to establish a contract. Third, those Customs Service employees who interacted with the plaintiffs had no authority to contract on behalf of or to obligate the Customs Service

for any of the expenses prayed for in this case. In the end, no sting operation ever materialized, no undercover cargo of contraband was ever shipped on the plaintiffs' vessel, and no arrests or seizures ever occurred. The plaintiffs have failed to establish an obligation on the part of the United States Customs Service to pay any monetary damages.

### CONCLUSION

For all the reasons stated above, the Court concludes that the plaintiffs are not entitled to the relief requested, and the Complaint is to be dismissed. The Clerk is directed to dismiss the plaintiffs' Complaint in its entirety and to enter judgment for the defendant.

No costs.